SNEED J.,
delivered the opinion of the court.
The defendants, Rolfe S. Saunders and Isaac S. Clark, were, on the 4th of September, 1870, the proprietors and publishers of a newspaper in the city of Knoxville, called the “ Sunday Whig and Register.” At that time a litigation was pending in the Chancery Court at Knoxville, in which John Baxter, the plaintiff in this action, was the complainant, and Jos. A. Mabry and others were the defendants; and on the day aforesaid, air article, purporting to be a speech delivered by Joseph A. Mabry in said chancery cause, appeared in the columns of the said Sunday Whig and Register. The article contains an angry and violent defamation of the character of the plaintiff and his family, and was introduced to the public in the words following: “ Knox county Chancery Court. *372 By permission of Chancellor Temple, the following is published: John Baxter v. Jos. A. Mabry et al. In this case General Mabry arose and spoke as reported substantially as follows:” Then follows the defamatory artice. On the 10th day of September next thereafter, the plaintiff brought this action of libel against the said publishers, Saunders & Clark, in the Circuit Court of Knox county. The case was submitted to a jury at the February Term, 1871, and resulted in a verdict and judgment in behalf of the plaintiff for $27,000, from which the defendants have appealed in error. It appears in the proof that at the time of the publication of the article in question, the defendants, who had rec'ently bought the press of the Whig and Register from Joseph A. Mabry, were comparative strangers in the city of Knoxville; that they had only resided in said city a few weeks; that the defendant Clark was a stranger to the plaintiff, and that the defendant Saunders was at the time of said publication absent from the city and knew nothing of it; that the defendant Clark caused said article to be published as an advertisement, without a knowledge of its contents, and at the request of Mabry, and believing it to be, as he states, a part of the proceedings in the Chancery Court in the case referred to, as Mabry had represented it to be a speech of his in said cause. He was admonished, however, by the editor, Col. Rockett, that the article was not a proper one to be published. It is shown, also, that upon the arrival of Saunders he asked who had published the article, expressed his indignation and regret at the *373 publication; stated that he would not have had the article published for thousands of dollars, and said that he would at once call upon the plaintiff and explain the matter. On the following morning he addressed the following letter to the plaintiff, marked “ private”: “ On my return to the city yesterday, I regretted to find in the "Whig and Register a publication concerning the Baxter-Mabry difficulty. It was a matter that I had determined to exclude from our columns even as advertisements, and had I been here, would have adhered to this purpose. The columns having been open to one side,’ will be offered to the other to the same extent and on the same terms should it be desired, but after that no further publication of a personal character will be admitted under any circumstances or on any terms. This is in no unkindness to either party or to any body, but in accordance with a principle I long since adopted in such matters, and from which I have never deviated, except in this last case, when it whs done in my absence. I have no disposition to meddle or interfere with the personal difficulties of others, and certainly none in your case, as our relations have always been friendly and my feelings toward you could not be otherwise.”
On the day the above letter was written, the plaintiff replied thereto in the words following:
“'Tour favor is received. I can accept no private apology or explanation for the wrong which you have done me. If you want to repair the wrong, do it in an open and manly way. If you do not, my *374 duty to myself and family is a plain one and I will discharge it.”
This correspondence was had on the 5th of September, 1870. It appears that no public explanation was made, and on the 10th of September thereafter this action was commenced. After the beginning of the action, and on the 12th of January, 1871, the following article appeared in the columns of the defendants’ newspaper:
“Another Unfortunate Editor. — From the article we copy below from the Cincinnati Enquirer, it will be seen another editor has put his foot in it for $50,000 damages, and the fund will now swell to $400,000!!!
“ The Enquirer of Monday says: ‘A Col. Baxter, of Tennessee, had a considerable amount of character to dispose of and managed to get himself libeled. He has brought suit against the following papers and persons: Nashville Banner, $50,000; Union and American, V $50,000; Athens Post, $50,000; Sweet Water Enterprise, $50,000; Knoxville Whig and Register, $50,000; Joseph A. Mabry, $50,000. If Col. Baxter gets paid for the amount of his damages he will have $350,000 — a very comfortable sum. • But if lie has any character left, he had better keep it. He can not afford to dispose of much more even at the highest market price.’”
This latter publication was introduced upon the trial on behalf of the plaintiff to indicate the quo animo and intent of the prior publication of the 4th of September, 1870, upon which the action was brought.
*375 The defendants objected to its introduction as evidence, but the objection was disallowed and the article was submitted to the jury. The defendants demurred to the declaration, which is in the simple form prescribed by our statutes, upon the ground that the publication containing the matter alleged to be falsely and maliciously published by the defendants purports on its face to be matter spoken in the course of legal argument in the Chancery Court at Knoxville, in the case of John Baxter v. Jos. A. Mabry, and that the same was published by permission of the Chancellor. The demurrer was overruled, and the defendants thereupon entered a plea of not guilty, and gave the plaintiff notice of the special defense that the matter complained of was a proceeding in a court of justice and that the publication thereof was made in the bona fide discharge of their duty as journalists. The testimony of the Chancellor presiding at the' time this alleged speech was made by Mabry, is taken in the case, and is to the effect that Mabry did appear in his court and ask permission to reply to some remarks made on a previous day by the plaintiff; and. that, holding a manuscript in his hand, he did proceed to make a speech, but that he, the Chancellor, perceiving the personal and offensive tendency of his remarks, frequently checked him and finally required him to resume his seat; whereupon Mabry observed that he could publish his speech, to which the Chancellor replied, “ certainly, that is the proper place to discuss personal, matters, and not in this court.” The Chancellor states that about the same conversation oc *376 curred between himself and Gen.. Mabry afterwards in the street; that he did not suppose that what he said on either occasion could be construed into a permission — which he had no right to give, either as a judge or as a citizen — that the speech which Mabry was prevented' from making in court might be published in a newspaper; that his only purpose was to admonish the party that such remarks would not be tolerated in open court. The Chancellor further testifies, that at the time Gen. Mabry attempted to make said speech there was no cause on trial and no motion- pending to which he proposed to address himself.
In the progress of the trial the defendant’s counsel was proceeding to read to the jury certain letters and articles contributed to the Chronicle newspaper by the plaintiff, of a highly inflammatory character, charging Jos. A. Mabry and others with fraud and corruption in the management of certain public moneys, and tending to illustrate the ferocity of a long and angry feud, which for many years had existed between said Mabry and the plaintiff. The plaintiff objected to partial extracts from those articles, and insisted upon his right to have the whole submitted to the jury: whereupon it was -agreed between the parties that the whole should be considered as read and the subject of comment in argument. This opened a wide field of argument not germain to the issues involved in this cause, but which, so far as it related to the matter discussed in these several publications, was rendered legitimate by the agree *377 ment of the parties that all the publications should be submitted to the jury as evidence. The discussion which followed, involving matters and occurrences with which these defendants were in no manner connected, was certainly inappropriate to the issues, and under the circumstances, perhaps injurious to these defendants. But so far as the contents of the letters were concerned, the defendants could not, with good grace, object, because they had made these letters evidence. The bill of exceptions, however, contains this statement: “The plaintiff concluded the argument of the case before the jury, and occupied some time in giving a history and account of Mabry’s attempt to assassinate him” — all this over the objection and remonstrance of the defendants. Now we find nowhere in these Chronicle letters of the plaintiff, nor elsewhere in this record, any evidence of, or allusion to, an attempt by Mabry to assassinate the plaintiff. If it be true then, as this record discloses, that the plaintiff, as his own advocate, occupied some time in giving an account and history of an attempt by the author of this defamatory article to assassinate him, it is manifest that these defendants have been required to bear other burthens than their own in this case. The solemn statement, by counsel of influence and character, of an unproven fact, is just as pregnant of results in affecting the minds of the jury as if the fact were attested by a sworn witness — in many cases infinitely more so. It is the duty of the nisi prius Judge to control the argument of causes before a jury so far as to direct and keep them in the line indi *378 cated by the case developed in the proof. Any immaterial divergence to give strength or ornament or illustration to an argument, is legitimate and allowable, and any ordinary indiscretion of counsel in the fervor of forensic controversy is not to be assigned as error here. But the deliberate statement of a fact, or a narrative of facts, by counsel, the effect of which upon the fortunes of his adversary is patent and inevitable, rests upon a very different principle. To permit outside influences or unproven facts to be thrown into the balance in determining the rights of parties, is “but the mockery and counterfeit of justice.” “The public interest requires,” said Chief Justice Parsons, “that litigating parties should have nothing to complain of, or suspect, in the administration of justice, and the convenience of jurors is of small consideration compared with this great object. It is better that everybody should suffer inconvenience than that a practice should be continued which is capable of abuse, or at least of being the ground of uneasiness and jealousy.” The learned Judge was referring to a case in which the Judge at nisi prius liad, after the retirement of the jury, sent them a supplemental charge in writing, in which he deprecated their failing to agree, and gave them such additional instructions as to the law as would enable them v to consider the cause in a more systematic manner: 1 G. &. W., 74; 2 Pick., 337. It was among the oracular utterances of Lord Coke, that. if the plaintiff, after evidence given and the jury have departed from the bar, or any for him, do deliver any *379 letter from the' plaintiff to any of the jury concerning the matter in issue, or any evidence, or any escroll touching the matter in issue, which was not given in evidence, it shall avoid the verdict, if it be found for the plaintiff, but not if it be found for the defendant; et sic e converso: 1 Co. Lifct., 227. “We take this plain position,” said the Supreme ”Court of North Carolina, “if the circumstances are such as merely to put suspicion on the verdict by showing, not that there was, but that there might have been, undue influence brought to bear upon the jury, because there was opportunity and chance for it, it is a matter within the discretion of the presiding Judge. But if the fact be that undue influence was brought, to bear on the jury, in all such cases there has been in contemplation of law no trial, and this court, as a matter of law, will direct a trial to be had:” 11 Ired., 513. And among the undue and improper influences which demand a venire de novo, the court mentions the taking or hearing of other evidence not given by the witnesses at the trial.
These are cardinal principles, which assume different shapes as they are uttered by different courts, but they are everywhere to be found in the text-books of the common law, and it is upon their due and proper enforcement the inviolability of the right of trial by jury reposes. Let us apply them to the facts of this case. It will be observed that Joseph A. Mabry was the author of the libelous publication on which this action is brought. He it was who had sold to these defendants the press in which the publication was made. *380 It was at bis special request that the defendant Isaac S.. Clark consented to publish the article, and upon his representation that it was a judicial proceeding. The theory of the prosecution was, that defendant Clark had been imbued by Mabry with all the special malice and ill-will of the latter against the plaintiff, and actuated by the malevolence of the old feud, they had conspired together to defame and destroy the good name of the plaintiff. It was legitimate, as matter of law, for the plaintiff to have shown this special malice on the part of defendant by any facts indicating a community of purpose between Mabry and himself, or that they sympathized with each other in a common hatred of an enemy common to both, either prior to or at the time of the publication. The strategy and vigor of the prosecution would therefore be addressed to the task of convincing the jury that defendant Clark was thoroughly impregnated with the malice and virus that Mabry felt against Baxter. If this could be done by fair comment upon the history of the feud, as embodied in the Chronicle letters made evidence by the defendants, it was legitimate to do so. But there was absolutely no testimony before the jury that any attempt had ever been made by Mabry to assassinate the plaintiff; and the “history and account” of such a transaction by the plaintiff was outside of the record, and it was improper and irregular in the court to permit it. We can easily conceive, under the circumstances of this case, how the passions of a jury could be lashed into fury by the fiery eloquence of a plaintiff, who, as his own *381 advocate, was permitted to bring up in judgment against these defendants the alleged wrongs of one who, for aught that appears in evidence to the contrary, was as much a stranger to the defendants at the time of these wrongs as the attempted assassination is a stranger to the record.
We are of opinion that the ruling of the court in permitting such latitude to the plaintiff in the argument of this cause was irregular and reprehensible. We are not prepared, however, to reverse the judgment on this account, especially iir the absence of a request by the defendants for specific instructions as to the effect of the plaintiff’s statement: Larkins v. Tarter, 3 Sneed, 686. But we prefer to reserve the question.
2. It is urged with great earnestness on behalf of the defendants that' there was error in the judgment of the court below in disallowing the demurrer. We do not think so. It is true that a bona fide report of the proceedings in a court of justice, in the absence of express malice, is not a libel, though the publication may be injurious to the character of an individual: 6 Bac. Abt, 349. Privileged communications of this nature are those made by counsel in the regular course of justS.ce; but to be protected they must be pertinent and material to the matter in controversy: Gilbert v. The People, 1 Denio, 41.
The publisher of libelous words, in the contemplation of law, is particeps eriminis with the utterer. A want of personal acquaintance with the party defamed is no excuse to the publisher, nor is a want of knowledge of the publication by a joint publisher any excuse to
*382 him: 6 Bac., 350, 355, 356. There is nothing more abhorrent to the law than the defamation of human character. But “the courts/’ says Chancellor Kent, “have found it embarrassing to preserve in just harmony and proportion the protection due to character, and the protection which ought to be afforded to the liberty of the press”: 1 Kent, 636. The press is free in this country — but not free to destroy the fair fame of' the citizen. In the case of Wright v. Woodgate, 2 Cromp., M. & R., 573, it is said: “A privileged communication means nothing more than that the occasion of making it rebuts the prima facie influence of malice arising from the publication of matter prejudicial to the character of the plaintiff, and throws upon him the onus of proving malice in fact, but not of proving it ■ by extrinsic evidence only; he has still a right to require that the alleged libel itself shall be submitted to the jury, that thly may judge whether there is evidence of malice on the face of it: 3 IT., 288. With respect to words used in the course of a judicial proceeding, it has been ruled, says Lord Eldon, that they are protected ,by the occasion, and can not form the foundation of an action without proof of express malice: Johnson v. Evans, 3 Esp., 32. And in Hodgsen v. Scarlett, it is said by Hol-royd, J., spehking of the words of counsel in the argument of a cause: “If they be fair comments upon the evidence, and relevant to the matter in issue, then, unless malice be shown, the occasion justifies them: 1 Barn. & Aid., 247; 3 H., 288. Abbott, J., in the same case, remarks: “ I am of opinion that no *383 action can be maintained unless it can be shown that the counsel availed himself of his situation maliciously to utter words wholly unjustifiable”: Id. In the case of Delegal v. Highley, 3 Bing., N. C., 950, Tindal, C. J., said: “ It is an established principle upon which the privilege of publishing the report of any judicial proceeding is admitted to rest, that such report must be strictly confined to the actual proceedings in court, and must contain no defamatory observations or comments from any quarter whatever in addition to what forms strictly and properly the legal proceedings.” These doctrines of the English courts have long been recognized and followed in this country; and we consider it to be the settled law here, as stated by the Supreme Court of the United States in the case of White v. Nichols, 3 H., 266, that malice may be proved though alleged to exist in the proceedings before a court or legislative body, or any other tribunal, although such court, legislative body, or other tribunal may have been the appropriate authority for .redressing the grievance represented to it; and that proof of express malice in any written publication, petition, or proceeding addressed to such tribunal, will render that publication, petition, or proceeding libelous in its character, and actionable, and will subject the author and publisher thereof to all the consequences of libel. The question of malice is to be submitted to the jury on the face of the publication itself: vide White v. Nichols, 3 H., 291; Cooley on Cons. Lim., 442, et seq. Applying these principles to the question raised by the defendant’s demurrer, the court could easily discern, upon *384 inspection of the publication in this case, whether it falls within the class of publications protected by the law. The mere recitation in the introduction that it was a proceeding in court does not make it so, nor would the fact that it was such a proceeding make it privileged if it contained within itself intrinsic evidence that it was not uttered with good motives or for justifiable ends. We hold that the court committed no error in disallowing the demurrer in this case.
3. We can not interfere with the discretion of the jury upon the argument that the damages assessed in this case are excessive. We intimate no opinion upon that point but as the defendants are to have the benefit of a new trial, we content ourselves with stating some general rules upon that subject. The rule in such cases is, that the actual damages are lo be assessed upon a careful consideration of the charge against the plaintiff, the circumstances of the publication, the extent of the circulation, and the natural and necessary consequences of such a publication, according to the results of human experience: Hil. on Rem. Torts, 456. This principle was, in substance, embodied in the charge of the court to the jury. Upon this subject the Supreme Court of the United States, in Day v. Woodworth, 13 H., 363, uses the following language: “A jury may inflict what are called exemplary, punitive or vindictive damages upon a defendant, having in view the enormity of his offense rather than the measure of compensation to the plaintiff. We are aware that the propriety of this doctrine has been questioned by some writers,, but if re *385 peated judicial decisions for more than a century are to be received as the best exposition of what the law is, the question will not admit of argument.. In many civil actions, such as libel, slander and seduction, the wrong done to the plaintiff is incapable of being measured by a money standard, and the damages assessed depend on the circumstances, showing the degree of moral turpitude or atrocity of the defendant’s conduct, and may properly be called exemplary or vindictive rather than compensatory.” There is no doubt, said Lord Mansfield, that the court has the power of taking the opinion of another jury in any case where the damages were excessive; but all these questions depend on their own circumstances, on which the court would exercise its discretion. Unless the damages are unreasonable beyond measure the court will never interfere. To libel and slander suits, the rule is peculiarly applicable. Motions for new trials in these cases are greatly discountenanced. Next to actions for erim. eon., the courts have surrendered them to what Lord C. J. DeGrey calls the despotic power of a jury: 1 Gr. and Wat., 428, 426.
But we hold that there are certain cardinal rules upon this subject which the court and jury must not lose sight of. While it is true that the citizen can not be compensated in money for the injury done to his family by an atrocious libel or slander, yet the gist of the action is the malice, the temper and disposition with which the publication is made. The guilt, says Chancellor Kent, and the essential ground of action for defamation consists in the malicious im- *386 tention, and when the mind is not at fault no prosecution can be sustained: 1 Kent Com., 634. But there ar.e two kinds of malice, one or both of which may exist in every libelous publication. These are actual malice or personal ill-will to the party defamed, which may be shown to exist at the time of the publication; and malice in law, which is presumed from every publication which is libelous upon its face. I mean by libelous, such as is injurious and defamatory and Hot within the class of privileged publications heretofore discussed in this opinion. The damages should be assessed therefore with reference to this distinction. A reckless incaution on the part of a publisher is punishable in damages according to the circumstances attending it, and the injury likely to result to the plaintiff. Hence it is held that such a publication is. actionable against all the publishers alike, though some of them may lrtve been ignorant of it, and though those who published it were not personally known to the party libeled. But the existence of actual malice against the party injured may be cónsidered in aggravation of damages, as its non-existence may be weighed by the jury in mitigation thereof; and these consideration should be impressed upon the minds of the jury in all actions of this character. Upon this subject we may safely repose upon the doctrine of the Supreme Court of the United States already cited, that the damages assessed should depend upon the circumstances showing the degree of moral turpitude or atrocity of the defendant’s conduct.
*387 4. The next error assigned is the introduction as evidence by the plaintiff of the article copied by the defendants from the Cincinnati Enquirer. It will be remembered that this article was published on the 12th of January, 1871, about four months after this action was begun, and that it was submitted to the jury in evidence over the objections of the defendants. There is perhaps no subject treated in the books upon which there has been a greater diversity of judicial ruling than the question whether a plaintiff in an action of libel can, for the purpose of showing the quo animo and intent of a publication, introduce others made by the defendant after the one complained of, and after the commencement of his action. The law is commended by my Lord Coke as the perfection of reason. “The law is unknown to him,” said he, “who knoweth not the reasons thereof.” It would seem to be a rule without a reason, that the express malice of a publication made to-day may be established by another made twelve months after to-day; and yet we find many respectable authorities occupying both sides of this question. It is an established principle that either party in an action of libel may introduce evidence to show the existence or non-existence of malice- at the time of the publication. We can easily see how malice in fact at the time of a libelous publication may be shown by anterior acts indicating hatred and ill-will to the plaintiff, but how the mere angry words of a defendant uttered or published afterwards can show such malice, unless they contain some intrinsic and substantial admission of it, *388 is not easy of comprehension. We have in Tennessee but one direct authority upon this question. In the case of Howell v. Cheatham, Cooke’s R., 247, 249, this court said that evidence of words spoken after the commencement of the action is not admissible. Words spoken at different times previous to the institution of the suit, though not declared on, may be given in evidence in order to ascertain the intent with which the words declared on were spoken. But words spoken afterwards may be the ground of another action, and therefore ought not to be received in evidence: Coop., Cooke, 247; 2 Meigs’ Dig., s. 1777. If the first publication be of doubtful or equivocal import, and the second refers to and explains it so as to remove all doubt or ambiguity as to whether the words were intended to be libelous or not, then perhaps the second would be admissible: Witcher v. Richmond, 8 Hum., 475. But if the words of the first publication be unequivocally libelous, we are unable to see upon what principle a subsequent publication can be adduced in evidence for any purpose. In the vast number of conflicting authorities upon this subject, the rulings seem arbitrary and are in the main given without reason. And as the rulings opposed to our Tennessee doctrine are so barren of all reason, we are fain to refer them to the earlier stages of English jurisprudence, when prosecutions for seandalwn magnatum were common, and when power and patronage were wont to “ shove by justice,” and British Judges were less the ministers of justice to the lofty and the lowly, as they now are, *389 than the supple instruments of a powerful peerage: 1 Vents., 60; Buller’s Nisi Prius, 4; 3 Shars’ Bl. Com., 124.
To illustrate briefly the conflicting views of the courts upon this subject, it is only necessary to state that in some cases the admissibility of other words or writings has been limited to those which were not in themselves actionable: Mead v. Daubigny, Peak’s Col., 125; Bodwell v. Osgood, 3 Pick., 376; Defries v. Davis, 7 C. & P., 112; or for which damages have been recovered: Symmons v. Black, 1 M. & Rob., 577. In other cases it has been restricted to words or writing relating to those alleged in the declaration: Finnerty v. Tipper, 2 Camp., 72; Delegal v. Highley, 8 C. & P., 444; Barnell v. Adkins, 1 M. &. G., 807; Ahem v. McGuire, 1 Armstrong & Macartney, 39; Bodwell v. Osgood, 3 Pick., 376. In others the admissibility of subsequent words has been limited to cases where the intention was equivocal or the words ambiguous: Stuart v. Lovell, 2 Stark R., 93; Pearce v. Ormsby, 1 M. & Rob., 455; while in the case of Fisher v. Patterson, 14 Ohio, 418, it was held that distinct or separate libels not declared on, can not be introduced in evidence and relied on by either plaintiff or defendant to show malice, or to aggravate or mitigate damages. And so, says another authority, if the words declared on are not ambiguous, or the libelous intention be not equivocal, evidence of subsequent words of the same import has been refused: 2 Saund. PI. and Ev., 951. Libels published in the same paper six years before the publication of the libel com *390 plained of, and under the same editorship, were properly received on the part of the plaintiff in evidence, the Judge having directed the jury not to take thprior publication into consideration in estimating damages, but only for the purpose of ascertaining the animus of the defendant: 2 Saund., 952; Barrett v. Long, 8 Ir. Law R., 331.
It is the prevailing doctrine, says Hilliard, though the authorities are conflicting, confused, and by no means reconcilable, that evidence of defendant’s subsequently repeating the slander or libel is inadmissible; but such evidence, or evidence of previous words, when the defendant’s intention is- at all equivocal, is clearly admissible to show malice: 1 Hil. Torts, 311. Upon this distinction, it is said, with great good sense, that the purpose of such evidence as stated seems rather verbal than practical, inasmuch as the amount of damages in this action must always materially depend upon the motives of the defendants: Vid. 32 N. H. Rep., 458. In Finnerty v. Tippin, 2 Campb., 72, which was an action for a libel published in a periodical, Mansfield, C. J., refused to admit in evidence subsequent numbers of the work unless they expressly referred to the libel for which the action was brought; for the subsequent publication, he said, might contain the most scandalous matter, while the former libel may have contained almost nothing, and the necessary consequence would be that the jury would give damages for the second libel in an action for the first: 3 Phil. Ev., 467. In Vincent v. Dixon, 5 Ind. R., 76, it is said that the *391 plaintiff can not be permitted to prove other slanderous words or libels not set forth in the complainant’s declaration in aggravation of damages, unless the statute of limitations has already run against the words which are proposed to be proved: 6 Hill R., 518. And it is said, that as the ground for admitting evidence of other libels is to show the intention when it is equivocal, and not for the purpose of enhancing damages, Lord Ellenborough rejected evidence of this nature in a case where there was no doubt respecting the intention of the defendant: Stuart v. Lovell, 2 N. P. C., 83. In Finnerty v. Tippin, already cited, Mansfield, C. J., said: “ You might as well give in evidence one highway robbery on the trial of another”: 2 Camp., 72. In Thomas v. Crosswell, 7 John, 271, Spencer, J., intimated his opinion that subsequent publications were not admissible in evidence, even to to show the quo animo: 2 Stark on Slander, 53. “ No evidence can be given,” says Sedgwick, “ of words spoken after the beginning of the action”: Sedg., M. D., 104; Gorlin v. Corry, 7 Mann, and Cr.; Root v. Lowndes, 6 Hill, 518: Keenholts v. Becker, 3 Denio., 346. And so in criminal prosecutions for libel, it is held that anterior publications may be heard with a view to establish malice in fact, but that posterior publications may not: 3 Wheat Am. Cr. Law, s. 2595; Thomas v. Crosswell, 7 Johns R., 270; U. S. v. Crandall, 4 Cranch, C. C. R., 683, et vid.; Bodwell v. Osgood, 3 Pick., 376; Watson v. Moore, 2 Cush., 133; Baldwin v. Soule, Gray, 321. And the plaintiff can not give in evidence other subsequent declarations by *392 defendant when the intention of the publication is not equivocal: 1 Tidd Pr., 652; 2 Stark, N. P., 93; 8 Moore, 467; 1 Bing., 403.
In view, therefore, of this great conflict and confusion of authority upon this question, and of the reasons of the law, we feel a sense of safety in adhering to our own rulings upon this subject, that a plaintiff in an action for libel can not adduce in evidence for any purpose a publication of the defendant made subsequent to that sued on, unless the subsequent one be an explanation or confession of the former, or contain an express admission of the malicious intent in the first publication. We think that in this ruling of our fathers lies the sense and reason of the law.
Reverse the judgment and remand the cause for a new trial.