PAMELA LANGFORD, etc. v. The VANDERBILT UNIVERSITY et al.

ROBERT L. LANGFORD v. The VANDERBILT UNIVERSITY et al.

MRS. ROBERT L. LANGFORD v. The VANDERBILT UNIVERSITY et al. —318 S. W. (2d) 568.

Middle Section. July 3, 1958.

Certiorari denied by Supreme Court December 12, 1958.

696

Sims Crownover, Thomas G. Watkins, James A. Carney and Watkins & Crownover, Nashville, for plaintiffs Mr. and Mrs. Langford and their daughter, Pamela Langford.

Cecil Sims and Bass, Berry & Sims, Nashville, for The Vanderbilt University.

Stanly T. Snodgrass and Stokes & Snodgrass, Nashville, for Ormonde Plater.

K. Harlan Dodson, Jr., and Louis Farrell, Jr., Nashville, for Benson Printing Co.

FELTS, J. These three suits were brought by the Reverend Mr. Robert L. Langford, his wife, and their four-year old daughter, Pamela (by him as next friend), each for $100,000 damages for libel for an item published in a student newspaper at Vanderbilt University known as the Hustler. The University, the student editor of the Hustler, Ormonde Plater, and the printer, Benson Printing Company, were joined as defendants.

This item appeared in the Hustler January 28, 1955, as a news story of the pleadings in six lawsuits filed January 20, 1955, by these plaintiffs for libel and invasion of privacy by a publication May 17, 1954, in another undergraduate student paper at Vanderbilt, called the humor magazine, or the Chase; those six prior suits being against the University, the student editor of the Chase, James Gilliland, and the printer, Joyner-Hogan Printing Company.

With these three libel suits for the Hustler publication, plaintiffs brought three other suits on the same matter for invasion of their right of privacy. In these six latter suits defendants demurred to plaintiffs' declarations. The Trial Court sustained the demurrers. The Supreme Court affirmed in the suits for invasion of plaintiffs' privacy, holding this publication was not an invasion of their privacy, because it referred only to matters already made public by plaintiffs themselves in their six prior suits. See opinion on the former appeal, Langford v. Vanderbilt University, 199 Tenn. 389, 287 S. W. (2d) 32.

The Court reversed in these three libel suits. It held that publication of a report of the contents of the pleadings in those six prior suits, even though no judicial action had been taken thereon, was privileged, if such report was fair and accurate and made without malice; but that since these declarations alleged this report was defamatory, not fair or accurate, and made with malice, they were sufficient in law to state a cause of action; and the demurrers were overruled and the cases remanded for defendants to plead over and for further proceedings. 199 Tenn. 399, 405, 287 S. W. (2d) 37, 39.

On the remand defendants filed general pleas of not guilty and special pleas that this Hustler publication was privileged, (1) because it was a fair and accurate report of the contents of the pleadings in those six prior suits, and (2) because it was invited and consented to by plaintiffs. And Vanderbilt University further pleaded that it was not liable under the rule of *respondeat superior,* because the publication was not made by it or by any servant or agent for it.

Upon the trial at the close of the evidence for plaintiffs the Trial Judge directed verdicts for Vanderbilt University and Benson Printing Company, and at the close of all the evidence he directed a verdict for Plater, and entered judgments dismissing the actions. Plaintiffs appealed in error, and have assigned numerous errors upon the trial. Their first and main insistence is that the evidence was sufficient to take the cases to the jury and the judge should have submitted them.

Upon the evidence there was no dispute as to any material fact. As stated, the so-called humor magazine, or the Chase, was published by undergraduate students

at Vanderbilt University, and its editor was James Gilliland, and the printer Joyner-Hogan Printing Company. The alleged libelous matter appeared on page 7 of the Chase in its issue of May 17, 1954, in which it undertook to celebrate Mother's Day, by use of cartoons, pictures of young women and babies, etc., apparently in light or humorous vein.

Page 7 was taken up with four pictures all with the overall title, "Everyone Loves Mother", and each with its own legend underneath. The (1) upper left was a blank rectangle printed black, with "Father Loves Mother" under it. The (2) upper right was a picture of a small child, with this underneath: "Daughter Loves Mother (And wants to be one too!)". The (3) lower left was a picture of a boy in a T-shirt, his arm tatooed with a heart enclosing the word "Mother", with this below: "Sailor Boy Loves Mother". The (4) lower right was a picture of a face partly covered by a hood, with this below it: "Midwife Loves Mother".

There was nothing else on the page, nothing to refer to any of the plaintiffs, nothing to identify any of the pictures, except that the one of the child happened to be a picture of Pamela Langford which had been made when she was two years old and delivered by her father to this same printer (Joyner-Hogan Printing Company) to have a cut made of it to print Christmas cards two years before; and, by mistake or inadvertence, the printer used this cut again in printing this page of Chase.

Plaintiff Mr. Langford had formerly been a student at Vanderbilt and was now a Methodist minister with a church in east Nashville, where he and his wife and daughter lived. When this issue of Chase appeared on

the Vanderbilt campus, someone recognized this picture of his daughter and called his attention to it. Soon thereafter all but a few copies of this issue were seized and destroyed and further publication of Chase was banned by the Student Publications Board at Vanderbilt.

In September 1954, however, there was talk that plaintiff was going to bring a lawsuit about this matter. Two students, Plater, editor of the Hustler, and Joe Puryear, a reporter for it, went to see him, told him they were from the Hustler, had heard he was going to sue the University because of Chase's unauthorized use of his daughter's picture, and that, if so, they asked him for an interview and to let them publish a news story about it. He told them he had decided to bring suit, and gave them an interview for the story.

This took place at his home in the presence of his wife and daughter and a friend. It was all very friendly and cordial. He let them take some pictures, and then showed them some pictures of his daughter—one of her in a Vanderbilt T-shirt—and told them they might select one to be used with the story. Thereupon his friend suggested he call his lawyers, and after talking to them on the telephone, he told these students he would not release any picture and referred them to his lawyers for the legal details.

He was willing, however, for them to print the story. In fact, he told them he wanted publicity. Plater testified: "He told us that he wanted publicity in the matter, and to go and contact his lawyers for legal details". Puryear testified he said: "I want publicity". And he really did not deny it. In his cross-examination he admitted he had told them he wanted publicity, and then explained:

"A. I wouldn't have minded having a fair statement of the facts presented to the public. I was not ashamed of what I was doing. I believed that I was doing the will of my Almighty God in fighting this and I didn't care if we had received publicity that would have presented it in its true light."

Acting upon his suggestion, Puryear went to see his lawyers, Messrs. Watkins & Crownover, and Mr. Watkins told Puryear he would call him when the suits were filed. On January 20, 1955, he telephoned Puryear that the suits were being filed at 3 o'clock that afternoon. Puryear told him it was too late to get the story in the next Hustler (Jan. 21), but he would put a bulletin in that issue, and carry the complete story in the following issue (Jan. 28); and Mr. Watkins said he would like to have a copy of it.

That afternoon the declarations were filed, with page 7 of the Chase as a part thereof. These pictures and legends have been described above, and are sent up in the original (Ex. A to decl.). Mr. Langford made his own interpretations of them with innuendoes to their meanings which he took as charges of unchastity against the child, the mother, and himself; and his lawyers put them into the declarations. The gist of these defamatory charges was as follows:

(1) "* * * that Plaintiff [the child], although of the extreme tender age of two years was interested in and amenable acts of illicit sexual intercourse and carnal knowledge * * *."

(2)"* * * that Plaintiff [Mrs. Langford], was engaged in sexual intercourse in a darkened bed-

room, and that she was intimate with, interested in and amenable to acts of illicit sexual intercourse or carnal knowledge with the sailor pictured and others * * *,"

(3)"* * * that Plaintiff [Mr. Langford], a clergyman, was engaged in sexual intercourse in a darkened bedroom, he being the father of Pamela whose photograph was adjacent thereto * * *."

Upon being informed by Mr. Watkins of the filing of these declarations, Plater and Puryear went to the Circuit Court Clerk's office where they were on file, read them, and undertook to write a report or summary of their contents. It was this report which was carried as a news story in the Hustler January 28, 1955 and on which were based the three libel suits now before us. It appeared on the first page under this head:

$180,000.00 Suit Filed By Local
Minister Over Chase Photo
Claims Issue 'Lewd, Bawd, Vulgar;'
'Spread Sex, Filth, Slime and Smut' ".

It stated that six suits for a total of $180,000 had been brought by plaintiffs (naming them) against defendants (naming them) for libel and invasion of privacy in the unauthorized use by the Chase of plaintiff Mr. Langford's daughter's photograph; and it stated the gist of plaintiffs' charges—the alleged defamatory matters—in their own language, by quoting from the declarations and reproducing page 7 of the Chase, as part of the declarations, and as necessary to an understanding and an accurate report of their contents.

A copy of this issue of the Hustler was put in evidence by plaintiffs and is sent up in the original (Ex. 1, Langford). It reproduced page 7 of the Chase, with this explanation: "Page seven of last May's 'Mother's Day Issue' of the Chase included a photo (top right) of little Pamela. Picture at top left is supposed to be totally black. Midwife is Dan Finch, who has not filed suit thus far". And it quoted three paragraphs from the declarations in the libel suits by Mrs. Langford and her daughter—one quoting the matter alleged to be defamatory of the daughter, another quoting the matter alleged to be defamatory of Mrs. Langford, and the third quoting allegations that that issue of Chase consisted throughouts its 25 pages of "lewd, bawd, vulgar, lascivious, suggestive and sex-laden stories, articles and so-called 'jests' ".

It is undisputed that each of the quoted parts of the declarations was accurate. It is also undisputed that the reproduced part of the declarations—page 7 of the Chase —was accurate. Nor is it charged in any of the declarations in the suits now before us that the explanation accompanying this reproduction, above quoted, was false, defamatory, inaccurate, or unfair. It is also undisputed that all the other matter in the Hustler story—the narrative—was correct and accurate so far as it went.

Plaintiff Mr. Langford testified at length, was a most intelligent witness, admitted in his cross-examination that all the quotations from the declarations were accurate. Then he was asked to point out what else should have been quoted or put in the story. He pointed to one or two merely formal matters. But on seeing that they had been substantially stated in the narrative, he

said he thought there should have been no quotations at all. He testified:

"Q. Do you find anything else that you think these boys should have put in the Hustler? A. No sir. I have stated that I don't think there should have been any quotations there." (Tr. p. 70.)

■ Such being the undisputed facts in evidence, we think they made out the defenses (1) that this Hustler publication was qualifiedly privileged, as being a fair and accurate report of the contents of the declarations in the prior suits, and (2) that it was absolutely privileged, as having been invited and consented to by plaintiffs; and that upon these grounds verdicts were properly directed for defendants.

■ Much of the argument for plaintiffs is directed to showing that this Hustler publication was libelous *per se*. But if it was, that does not affect the defense of privilege; for privilege in the law of libel and slander means privilege to publish defamation without liability. Gatley on Libel and Slander (3d Ed., 1938), 186, 214; Prosser on Torts (2d Ed., 1955), 606; Winfield on Tort, p. 333.

"The law recognizes that there are some occasions on which there ought to be no liability for defamation because the interests of the public, or (exceptionally) those of the individual who originates the defamation, outweigh the plaintiff's right to his reputation. Such occasions are said to be 'privileged.' * * * Whether it exists or not in any given case is a question of law for the judge". Winfield, Tort (6th Ed., 1954), 333.

" '[T]here are ocasions on which a person may make defamatory statements about another which are untrue without incurring any legal liability for his statements' (Scrutton, L. J., in Watt v. Longsdon [1930] 1 K.B.,—, 130) ''. Gatley, supra, 214. Such occasions are classified as those of absolute privilege and those of qualified privilege.

The occasions of absolute privilege include, among others, statements made in judicial proceedings (Hayslip v. Wellford, 195 Tenn. 621, 263 S.W. (2d) 136, 42 A. L. R. (2d) 820), in legislative proceedings, in proceedings of executive officers, and *"publications made with the consent of the plaintiff * * *."* (italics ours) (Prosser, 606); and the occasions of qualified privilege include, among others, publication of proceedings in court. Gatley, supra, pp. 186, 214, 328-352. Prosser, 606, 613, 623-624; American Publishing Co. v. Gamble, 115 Tenn. 663, 678, 90 S. W. 1005.

It is true some courts hold that the privilege of publication does not extend to papers filed in court on which no judicial action has been taken. But, as we have seen, on the former appeal in these cases, it was established by our Supreme Court, as the rule in this State, as well as the law of these cases, that the privilege does extend to papers filed in court even though no judicial action has been taken on them. Said the Court, per Justice Tomlinson:

"This Court concludes that the right of newspapers to publish without liability for damages does not extend to mere contents of pleadings filed in Court though no judicial action has been taken thereon, provided the publication is a fair and accurate

statement of the contents of the pleadings, and made without malice. Such is the rule, though the allegations of the pleading should prove to be false, or the truth thereof not established". Langford v. Vanderbilt University, 199 Tenn. 389, 399, 287 S. W. (2d) 32, 37.

■ Thus, on the remand of these cases, the issues were (1) whether this publication was "a libel of either of the Langfords" (Id., 199 Tenn. 400, 287 S. W. (2d) 37); and if so, (2) whether it was privileged, as a fair and accurate report of the declarations in those prior suits. The onus as to the first issue was on plaintiffs; as to the second it was on defendants. Assuming plaintiffs met the burden of showing the publication was libelous, it was for defendants to show it was privileged.

■■ While the burden is on the defendant to prove that the publication is a fair and accurate report of the proceeding in court, *"it is sufficient if this clearly appears from the plaintiff's own evidence"* (italics ours) (Gatley on Libel and Slander (3d Ed., 1938), 349, 350). And: "Where the published matter is plainly unambiguous, the question of its meaning and character is for the court * * *". American Publishing Company v. Gamble, 115 Tenn. 663, 678, 90 S. W. 1005.

"In order to be privileged the report must be a fair and accurate account of what took place in Court. It is not necessary that it should be *verbatim;* an abridged or condensed report will be privileged provided it give a correct and just impression of what took place in Court. It is sufficient to publish 'a fair summarized account.' " Gatley, supra, 335.

> "The report need not be a verbatim one, but it
> must contain the substance of the thing it under-
> takes to present, or the whole purport of any special,
> separable, part. * * *" American Publishing Com-
> pany v. Gamble, supra, 115 Tenn. 677, 90 S. W. 1008.

██ Such report must be confined to the actual legal
proceedings it undertakes to present. It must not con-
tain any false statements of fact as to what occurred, or
any garbled or one-sided account, or any "defamatory
observations or comments". Black v. Nashville Banner
Pub. Co., 24 Tenn. App. 137, 145, 141 S. W. (2d) 908,
913; Saunders v. Baxter, 53 Tenn. 369, 383; Prosser on
Torts (2d Ed.) 625.

> "Care should also be taken to keep such comments
> as are made separate from the facts reported, so that
> readers may be able readily to distinguish between
> the two. 'Comment, in order to be justifiable as fair
> comment, must appear as comment, and not be so
> mixed up with the facts that the reader cannot dis-
> tinguish between what is report and what is com-
> ment. The justice of this rule is obvious.' " Gatley,
> supra, 345, 378.

Upon these authorities, it is clear this publication was
privileged. Upon plaintiffs' own evidence it was a fair
and accurate report of the prior declarations. It gave
their material parts—quoted the gist of the charges and
reproduced page 7 of the Chase (Ex. A.), as necessary
to an understanding of the charges. It is undisputed that
these quotations and this reproduction were accurate.
It is also undisputed that the rest of the report—the
narrative as to the formal parts of the declarations—
was accurate as far as it went.

As we have seen, upon being asked to compare the declarations and the story, and to point out what else should have been put in the story, Mr. Langford himself said he did not find anything else he thought "these boys should have put in the Hustler". These writings —the declarations and the report—are plainly unambiguous, and a comparison of them demonstrates that the report gave a true and just impression of the contents of the pleadings and a fair and correct account of them.

For plaintiffs, it is argued that the Hustler arbitrarily quoted only three selected paragraphs out of a total of 63 paragraphs of six declarations; that it gave undue prominence to the "inculpatory facts"; and that it lost all claim to privilege because of its malicious and deliberate action "in lifting the most atrocious allegations from the prior declarations and in republishing the horrible page from the Chase".

These matters were put upon the record by plaintiffs themselves so that they might be read and known by the public as part of the proceedings in the court. "It is for the benefit of the public that they should be informed of what takes place substantially as if they were present" in court, and "such publication is merely enlarging the area of the court, and communicating to all that which all have the right to know" (Gatley, supra, 328-329). American Publishing Company v. Gamble, supra, 115 Tenn. 678, 90 S. W. 1008.

It was not necessary that this report quote the declarations *verbatim*. It was enough that it was a fair and accurate summary of their contents, that it gave a just and correct impression of them. This could not be done without giving the gist of the charges and the pic-

tures on which they were based. But in doing this, these students were careful to reproduce the pictures themselves and to give the defamatory matter by quoting the very words which plaintiffs themselves, through their able counsel, had chosen to state their cases in the strongest and most favorable aspect to themselves.

 Reference is made by learned counsel for plaintiffs to the Hustler's explanation accompanying its reproduction of page 7 of the Chase, and particularly to this part of it: "midwife is Dan Finch, who has not filed suit thus far"; and it is argued that this was such unjustifiable comment as evidenced malice and rebutted the claim of privilege.

It is true that such a report must not contain any "*defamatory* observations or comments". But it was not alleged in the declarations in the suits now before us that any part of the explanation accompanying the pictures, quoted supra p. 7 [318 S. W. (2d) 573], was false or defamatory. Without such an allegation, this matter cannot be made a ground of plaintiffs' actions; for it is "the rule that 'every material fact which constitutes the ground of plaintiff's action must be alleged in his declaration' ". Freeman v. Dayton Scale Co., 159 Tenn. 413, 418, 19 S. W. (2d) 255, 257; Lackey v. Metropolitan Life Ins. Co., 26 Tenn. App. 564, 578-584, 174 S. W. (2d) 575.

 Since this Hustler publication was qualifiedly privileged, as a fair and accurate report of the contents of the prior declarations, it was presumed to have been made *bona fide,* or without malice; and the burden was on plaintiffs to prove express malice. Gatley, supra, 315; Southern Ice Co. v. Black, 136 Tenn. 391, 402, 189 S. W. 861, Ann. Cas. 1917E, 695. They offered no proof

of any malice; but the evidence shows that there was no malice on the part of these two young students toward any of the plaintiffs, and that their relations were friendly and cordial.

■ And, as before stated, we think this publication was absolutely privileged, as invited or consented to by plaintiffs. All the evidence shows that plaintiff Mr. Langford told these two students he wanted publicity, referred them to his lawyers for the legal details, the lawyers advised them when the suits were filed, and they made a fair and accurate statement of the pleadings, giving the alleged defamatory parts in plaintiffs' own words.

■ "It is generally held that the publication, of a libel or slander, invited or procured by the plaintiff, or by a person acting for him in the matter, is not sufficient to support an action for defamation" (33 Am. Jur., Libel and Slander, sec. 93). Freeman v. Dayton Scale Co., supra, 159 Tenn. 417, 19 S. W. (2d) 255; Prosser on Torts, supra, 606, 613; 3 Restatement, Torts, 219-222.

So, we think the verdicts were properly directed for defendants upon these grounds. Plaintiffs assign numerous errors upon exclusions of evidence. We have fully considered all of them, find no merit in any of them, and think they need not be discussed in detail. All of the assignments of error are overruled and the judgments of the Circuit Court are affirmed. The costs of the appeals in error are adjudged against plaintiffs and the sureties on their appeal bonds.

Hickerson and Shriver, JJ., concur.