IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 17, 2009 Session

**TERESA GARD v. DENNIS HARRIS, M.D., ET AL.**

**Appeal from the Circuit Court for Knox County**
**No. 3-114-05      Wheeler Rosenbalm, Judge**

_____

**No. 2008-01939-COA-R3-CV  - FILED MARCH 11, 2010**

_____

Plaintiff filed a complaint alleging false light invasion of privacy and defamation after her physician sent a letter she considered defamatory.  After finding that plaintiff consented to the disclosure by signing a consent form, the trial court granted summary judgment in favor of the defendants.  We affirm.

**Tenn. R. App. R. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., and D. MICHAEL SWINEY, JJ., joined.

Arthur F. Knight, III, Knoxville, Tennessee, for the appellant, Teresa Gard.

Edward G. White, II, and Joshua J. Bond, Knoxville, Tennessee, for the appellees, Dennis Harris, M.D. and HealthStar Physicians, P.C.

**OPINION**

**I.  BACKGROUND**

In June 2002, Teresa Gard was employed by Sedgwick Claims and Management Services, Inc. ("Sedgwick").  During the course and scope of her employment, she fell and suffered a back injury.  She came under the treatment of various physicians and surgeons. Subsequently, she filed a workers' compensation claim in Knox County Chancery Court.  St. Paul Fire & Marine Insurance Co. ("St. Paul") provided workers' compensation benefits to Ms. Gard, and Concentra Integrated Services, Inc. ("Concentra") contracted with St. Paul to provide workers' compensation case management services for Ms. Gard's case.

Ms. Gard began treatment with Dr. Dennis Harris on February 4, 2004. She continued as his patient until Dr. Harris terminated the physician/patient relationship in a letter dated November 11, 2004. Ms. Gard's last office visit was October 15, 2004, and her next visit was scheduled for November 12. In the interim, however, Dr. Harris viewed a compact disc provided to him by either St. Paul or Concentra. Thereafter, Dr. Harris informed Ms. Gard that he would no longer provide her with medical care. Dr. Harris's letter to Ms. Gard contains the subject matter of her complaint. He also sent the letter to Dr. Edward Workman, the physician that referred Ms. Gard to Dr. Harris; Heidi Howard, the workers' compensation case manager, and Janie Jones; a representative of Concentra. In Ms. Gard's opinion, the letter suggests that she may be addicted to narcotics. Ms. Gard contends that the letter contains false and defamatory statements.

According to Ms. Gard, she was not abusing opiates and only took the medication as prescribed. She notes that, at the time of letter, Dr. Harris was the only physician prescribing medication to her. One day after receiving the letter, Ms. Gard took a drug test. The results were negative for the use of opiates.

After Ms. Gard's release from Dr. Harris, Dr. Workman refused to see her. Eventually, Ms. Gard lost all insurance coverage when she was terminated from Sedgwick. She asserts that she could not be re-certified for disability insurance because Dr. Harris never submitted his medical records.

Ms. Gard filed the Complaint on February 24, 2005. She alleged that St. Paul and Concentra wrongfully induced Dr. Harris to breach his fiduciary relationship with her as his patient. Ms. Gard also sued Dr. Harris and HealthStar Physicians, P.C., ("HealthStar") for various breaches of fiduciary duties, false light invasion of privacy, and defamation.

Subsequently, St. Paul filed a motion to dismiss, and Concentra filed a motion for summary judgment. Dr. Harris and HealthStar filed a motion to dismiss alleging that they were immune from suit and that the subject letter constituted a medical record pursuant to Tenn. Code Ann. § 50-6-204(a)(2)(b).

The trial court granted St. Paul's motion to dismiss; an agreed order was entered dismissing Concentra. The trial court found that the letter did not constitute a medical record pursuant to Tenn. Code Ann. § 50-6-204(a)(2)(b) and denied the motion of Dr. Harris and HealthStar.

Dr. Harris and HealthStar then filed a motion for summary judgment, alleging that Ms. Gard's complaint appeared to be a claim for medical malpractice. The trial court denied that motion as well. After discovery commenced, Dr. Harris and HealthStar filed another motion

for summary judgment. The trial court denied the motion, but instructed the parties to brief the issue of whether Ms. Gard consented to Dr. Harris's communication.

Dr. Harris and HealthStar subsequently filed a motion for summary judgment predicated on the issue of consent. The trial court granted the motion on July 31, 2008. This timely appeal followed.

## II. ISSUE PRESENTED

The sole issue before this court is whether the trial court properly granted summary judgment in favor of Dr. Harris and HealthStar.

## III. STANDARD OF REVIEW

In reviewing a trial court's grant of a motion for summary judgment, this court must determine whether the requirements of Tenn. R. Civ. P. 56 have been met. *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 88 (Tenn. 2000). Our inquiry involves only a question of law with no presumption of correctness attached to the trial court's judgment. *Id.* Under Tenn. R. Civ. P. 56.04, "[s]ummary judgment is appropriate when the moving party can show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law." *Hannan v. Alltel Publ'g*, 270 S.W.3d 1, 5 (Tenn. 2008) (citing Tenn. R. Civ. P. 56.04; *Byrd v. Hall*, 847 S.W.2d 208, 214 (Tenn. 1993)). In Tennessee, the moving party who does not bear the burden of proof at trial must either:

> (1)     affirmatively negate an essential element of the nonmoving party's claim; or
>
> (2)     show that the nonmoving party cannot prove an essential element of the claim at trial.

*Hannan*, 270 S.W.3d at 9. A "conclusory assertion" is not enough to shift the burden. *Id.* at 5 (quoting *Byrd*, 847 S.W.2d at 215). It is also not enough for the moving party to "cast doubt on a party's ability to prove an element at trial." *Hannan*, 270 S.W.3d at 8. However, if the moving party is able to affirmatively negate an essential element or show that the nonmoving party would be unable to prove an essential element, "the burden of production shifts to the nonmoving party to show that a genuine issue of material fact exists." *Id.* at 5; *see also Sykes v. Chattanooga Hous. Auth.,* No. E2008-00525-COA-R3-CV, 2009 WL 2365705, at *2-3 (Tenn. Ct. App. E.S., July 31, 2009).

## IV. DISCUSSION

Ms. Gard challenges the trial court's grant of summary judgment in favor of Dr. Harris and HealthStar. She contends that the trial court erred by finding that she consented to the disclosure of her protected health information by Dr. Harris and HealthStar. Ms. Gard argues that the boilerplate language of the consent form at issue was too vague to convey that by signing it, Ms. Gard would voluntarily waive her right to confidentiality.

The consent form at issue, "Patient Consent for Use and Disclosure of Protected Information," states "I hereby give my consent for HealthStar Physicians, P.C. to use and disclose protected health information about me to carry out treatment, payment, and health care operations." The form also contains Ms. Gard's signature and the date February 4, 2004. According to Ms. Gard, the term "health care operations" is not explained, and Dr. Harris's letter is not a medical record that falls within the purview Tenn. Code Ann. § 50-6-204. Relying on *Overstreet v. TRW Commercial Steering Div.*, 256 S.W.3d 626 (Tenn. 2008), Ms. Gard claims that an implied covenant of confidentiality exists between a doctor and a patient although the doctor is provided by the employer pursuant to the Tennessee Workers' Compensation Act. *See id.* at 634.

Nonetheless, this issue hinges on whether Ms. Gard consented to the publication of her protected health information. In Tennessee, the common law tort of false light invasion of privacy requires the plaintiff to prove that a defendant published a matter concerning the plaintiff, placing the plaintiff before the public in a false light which is highly offensive to a reasonable person, and the defendant had knowledge that his statement was false or acted recklessly with regard to the falsity of the publicized statement. *See West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 643-44 (Tenn. 2001).

To establish a prima facie case of defamation, the plaintiff must prove that: (1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other party; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement. *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999). "The basis for an action for defamation, whether it be slander or libel, is that the defamation has resulted in injury to the person's character and reputation." *Quality Auto Parts, Inc. v. Bluff City Buick, Co.*, 876 S.W.2d 818, 820 (Tenn. 1994). A written statement is not libel simply because the person who is the subject of the publication found it to be annoying, offensive, or embarrassing, but the words must be reasonably construed to hold the plaintiff up to public hatred, contempt or ridicule, and they must carry with them an element "of disgrace." *See* 17 Tenn. Juris., *Libel and Slander*, § 3, n. 15 (2009) (citing *Katahn v. Hearst Corp.*, 742 F.Supp. 437, 439 (M.D. Tenn. 1990)).

Consent is a defense to the torts of false light invasion of privacy and defamation. It is one of the few absolute privileges that defeats a plaintiff's claim of false light and defamation. In recognizing the tort of false light invasion of privacy, the Tennessee Supreme Court endorsed the approach of the Second Restatement of Torts. *See Media Gen. Convergence, Inc.*, 53 S.W.3d at 648. Section 583 of the Second Restatement provides that consent is an absolute privilege to defamation.[1] Section 652F incorporates §§ 583 and 592A and states that consent is a defense that applies to the invasion of privacy torts.[2] The comments of § 652F are instructive and provide, as follows:

> As is stated in the Comments under § 583, consent to any publication, either of matter that is personally defamatory or of matter that invades privacy, creates an absolute privilege so long as the publication does not exceed the scope of the consent. The consent given may be narrowly limited.

Restatement (Second) of Torts, § 652F cmt. b (1977).

Therefore, a plaintiff's consent to publication bars recovery for false light and defamation claims. "The occasions of absolute privilege include, among others, statements made in judicial proceedings, in legislative proceedings, in proceedings of executive officers, and 'publications made with the consent of the plaintiff . . . .'" *See Langford v. Vanderbilt Univ.*, 318 S.W.2d 568, 574 (Tenn. Ct. App. 1958) (citations omitted).

In the instant case, it is undisputed that Ms. Gard executed a written consent form before receiving treatment from Dr. Harris. It is also undisputed that Dr. Harris penned a letter to Ms. Gard informing her that she should cease taking narcotic medications and sent a copy of that letter to Dr. Workman, Ms. Howard, and Ms. Jones. The consent form at issue permitted Dr. Harris and HealthStar to reveal Ms. Gard's protected health information in order to complete "treatment, payment, and health care operations" thereby limiting disclosure of Ms. Gard's protected health information to one of the stated purposes. Thus, the next step in our inquiry is whether Dr. Harris's disclosure exceeded the scope of Ms. Gard's consent.

The Health Insurance Portability and Accountability Act ("HIPAA") is comprehensive

---

[1] "Except as stated in § 584, the consent of another to the publication of defamatory matter concerning him is a complete defense to his action for defamation." Restatement (Second) of Torts, § 583.

[2] "The rules on absolute privileges to publish defamatory matter stated in §§ 583 to 592A apply to the publication of any matter that is an invasion of privacy." Restatement (Second) of Torts, § 652F.

federal legislation that provides rights for patient confidentiality and "sets forth precise procedures for the disclosure of 'protected health information.'" *See Alsip v. Johnson City Med. Ctr.*, No. E2004-00831-COA-R9-CV, 2005 WL 1536192, at *9 (Tenn. Ct. App. E.S., June 30, 2005). HIPAA provides definitions relevant to this discussion and sheds light on whether Dr. Harris's disclosure exceeded the bounds of Ms. Gard's consent.

HIPAA permits doctors to use and disclose protected health information to carry out treatment, payment, and health care operations without the patient's authorization in specific circumstances. 45 C.F.R. § 164.506 (2009). It provides a list of activities that qualifies as "health care operations,"[3] but Dr. Harris's disclosure does not fall within the statutory

---

[3]Health care operations means any of the following activities of the covered entity to the extent that the activities are related to covered functions:

(1) Conducting quality assessment and improvement activities, including outcomes evaluation and development of clinical guidelines, provided that the obtaining of generalizable knowledge is not the primary purpose of any studies resulting from such activities; population-based activities relating to improving health or reducing health care costs, protocol development, case management and care coordination, contacting of health care providers and patients with information about treatment alternatives; and related functions that do not include treatment;

(2) Reviewing the competence or qualifications of health care professionals, evaluating practitioner and provider performance, health plan performance, conducting training programs in which students, trainees, or practitioners in areas of health care learn under supervision to practice or improve their skills as health care providers, training of non-health care professionals, accreditation, certification, licensing, or credentialing activities;

(3) Underwriting, premium rating, and other activities relating to the creation, renewal or replacement of a contract of health insurance or health benefits, and ceding, securing, or placing a contract for reinsurance of risk relating to claims for health care (including stop-loss insurance and excess of loss insurance), provided that the requirements of § 164.514(g) are met, if applicable;

(4) Conducting or arranging for medical review, legal services, and auditing functions, including fraud and abuse detection and compliance programs;

(5) Business planning and development, such as conducting cost-management and planning-related analyses related to managing and operating the entity, including formulary development and administration, development or improvement of methods of payment or coverage policies; and

(6) Business management and general administrative activities of the entity, including, but not limited to:

(i) Management activities relating to implementation of and compliance with the requirements of this subchapter;

(ii) Customer service, including the provision of data analyses for policy holders, plan sponsors, or other customers, provided that protected health information is not disclosed to such policy holder, plan sponsor, or customer.

(iii) Resolution of internal grievances;

(iv) The sale, transfer, merger, or consolidation of all or part of the covered entity with another covered entity, or an entity that following such activity will become a covered entity and due diligence related to such activity; and

(continued...)

definition for that term. HIPAA also defines "treatment," as follows:

> Treatment means the provision, coordination, or management of health care and related services by one or more health care providers, including the coordination or management of health care by a health care provider with a third party; consultation between health care providers relating to a patient; or the referral of a patient for health care from one health care provider to another.

*See* 45 C.F.R. § 164.501.

HIPAA permits disclosure of protected health information "for treatment activities of a health care provider." 45 C.F.R. § 164.506(c)(2).

In the case at bar, Dr. Harris's letter communicated his suggestions for future treatment options for Ms. Gard; specifically, he suggested that she discontinue the use of narcotic prescription drugs after viewing a surveillance video of her activities. The surveillance video revealed Ms. Gard bending over in her front yard, entering a car with ease, and riding in a boat. Ms. Gard's activities on the surveillance video markedly differed from the level of movement and pain that Ms. Gard exhibited in Dr. Harris's office.

Although Dr. Harris communicated his intention to stop providing medical care to Ms. Gard, it appears that the letter was related to Ms. Gard's treatment within the meaning of HIPAA. The letter stated how Ms. Gard should proceed with finding health care services for her needs, and Dr. Harris shared that letter with individuals who were involved in the "management of health care" for Ms. Gard. *See* 45 C.F.R. § 164.501. Dr. Harris did not disclose any of Ms. Gard's protected health information to anyone who was not connected to the management of her health care or to the workers' compensation case. In fact, Dr. Workman was the physician that referred Ms. Gard to Dr. Harris; Ms. Howard was the workers' compensation case manager assigned to Ms. Gard's case; and Ms. Jones was a representative for Concentra, a company that contracted with St. Paul to perform workers' compensation case management services for Ms. Gard. Thus, Dr. Harris's disclosure of Ms. Gard's protected health information was permissible under HIPAA because the disclosure was for the purpose of Ms. Gard's treatment.

---

[3](...continued)
(v) Consistent with the applicable requirements of § 164.514, creating de-identified health information or a limited data set, and fundraising for the benefit of the covered entity. *See* 45 C.F.R. § 164.501 (2009).

After reviewing the applicable HIPAA provisions and the facts of this case, Dr. Harris's disclosure of Ms. Gard's protected health information did not exceed the HIPAA standards or the bounds of Ms. Gard's consent. Even though Ms. Gard claims that the consent form was a contract of adhesion without any explanation of the terms like "health care operations," we do not find her argument persuasive. Ms. Gard offers no proof to substantiate this claim; nothing in the record supports her claim that this was a contract of adhesion. *See Vickery Transp., Inc. v. HEPACO, Inc.*, No. W2003-01512-COA-R3-CV, 2004 WL 2280421, at *4 (Tenn. Ct. App. W.S., Oct. 4, 2004) (holding that the plaintiff failed to prove that there was a contract of adhesion). Even if we deem the consent form at issue as invalid or a contract of adhesion, it would be of no consequence because HIPAA permits Dr. Harris's disclosure for treatment purposes.

## V. CONCLUSION

Accordingly, we affirm the trial court's grant of summary judgment in favor of Dr. Harris and HealthStar. Because consent bars recovery of Ms. Gard's false light invasion of privacy and defamation claims, no genuine issues of material fact exist and Dr. Harris and HealthStar are entitled to a judgment as a matter of law. We will not address the merits of the remaining arguments raised by Ms. Gard because we have decided the dispositive issue of this appeal.

The trial court's order granting summary judgment is affirmed. Costs on appeal are taxed to the appellant, Teresa Gard. The case is remanded, pursuant to applicable law, for collection of costs assessed below.

_____
JOHN W. McCLARTY, JUDGE