IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
August 12, 2015 Session

## GREG GRANT v. THE COMMERCIAL APPEAL, ET AL.

**Appeal from the Circuit Court for Shelby County**
**No. CT00200514     Robert L. Childers, Judge**

_____

**No. W2015-00208-COA-R3-CV – Filed September 18, 2015**
_____


Plaintiff brought action for defamation and false light invasion of privacy based on an allegedly defamatory newspaper article published by defendant newspaper, reporter, editor, and publisher. Defendants moved to dismiss, claiming that liability was precluded based on the fair report privilege. Defendants also asserted that plaintiff failed to state a cause of action upon which relief may be granted because the article's statements were not capable of being defamatory. The trial court granted the motion to dismiss, finding that the article was not capable of defamation and that the fair report privilege applied. We reverse in part as to the determination that the fair report privilege applied; affirm in part as to the dismissal of the defamation and false light claims; and reverse in part as to the defamation by implication claims.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed in Part; Affirmed in Part; and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the Court, in which ARNOLD B. GOLDIN, J., and KENNY ARMSTRONG, J., joined.

Christopher F. Donovan, Memphis, Tennessee, for the appellant, Greg Grant.

James Bennett Fox, Jr., and Lucian T. Pera, Memphis, Tennessee, for the appellee, The Commercial Appeal, Memphis Publishing Company, Mark Perrusquia, Louis Graham, and George Cogswell.

# OPINION

## I. Background

In October 2013, *The Commercial Appeal*, a newspaper in Memphis, Tennessee, published a print and online version of an article ("Article"). The printed version was titled "Whitehaven Project Unsure," and its headline stated, "Greg Grant involvement clouds $1.5 million Southbrook [Mall] deal." The online version of the Article was titled, "Silent Partner? Grant's involvement clouds $1.5 million Southbrook Mall deal."[1] The Article was written by Marc Perrusquia. Both the print and online versions detailed Plaintiff/Appellant Greg Grant's involvement in a recently-approved investment by the Memphis City Council to fund the revitalization of the Southbrook Mall located in the Whitehaven neighborhood of Memphis.

The Article explained that Mr. Grant had a vision for the currently "aging, largely vacant" Southbrook Mall, including new retail stores and a theater. However, government funding was presumably necessary to the success of such a project. The Article continued:

> Grant's vision, shared with city leaders in meetings a year ago, resulted in the Memphis City Council this month conditionally approving a $1.5 million grant for the project. Yet, according to an examination by The Commercial Appeal, Grant didn't mention in his pitch that he owes the federal government nearly $6 million.

The Article noted that Mr. Grant stated he had no financial interest in the project, yet indicated that various state records and other transactions Mr. Grant has been involved with suggested otherwise. Additionally, a reporter from the paper, as noted in the Article, investigated the premises and discovered that Mr. Grant maintained an office on the mall's property.

The Article also contained a quote attributed to Councilman Jim Strickland in which the councilman stated that the Southbrook Mall project was the "worst project we ever approved," and stated that the council was unaware that Mr. Grant was apparently one of the project's principals. Still, the Article also provided other commentary attributed to Willie Harper, a "frat brother" of Mr. Grant and president of A&A Bail Bond, who stated that Mr. Grant worked on the Southbrook Mall project free of charge as an adviser and organizer. Mr.

---

[1] Substantively, both versions of the Article are nearly identical, and any distinction is unimportant for purposes of this appeal unless noted.

Grant believed the substance of the Article to be defamatory to him, and he retained counsel several months after the Article's publication.

On March 31, 2014, counsel for Mr. Grant sent a letter titled "Notice of Intent to Sue Under T.C.A. § 29-24-103" to Mr. Chris Peck, then-Editor of *The Commercial Appeal*. Counsel explained that he had been retained by Mr. Grant to file suit against the newspaper for libel. The letter provides that the Article's "ultimate impression [] created in the reader [is] that Mr. Grant is guilty of dishonesty, and is a liar by omission." Counsel's letter also stated that, unless the newspaper retracted the libelous statements, Mr. Grant would file suit. On April 2, 2014, counsel for *The Commercial Appeal* replied to the letter, denying that the Article contained any libelous or defamatory material and refusing to retract the Article.

On May 5, 2014, Mr. Grant commenced an action against several defendants based on the publication of the Article. Mr. Grant filed suit against Defendants/Appellees Memphis Publishing Company, doing business as *The Commercial Appeal*; the author of the Article, Marc Perrusquia; the editor of *The Commercial Appeal*, Mr. Louis Graham; and the publisher of *The Commercial Appeal*, George Cogswell, III (collectively, "Appellees"). Mr. Grant's original complaint alleged libel as his sole cause of action against Appellees.

Shortly after filing his original complaint, on May 8, 2014, Mr. Grant filed a "Notice of Filing Exhibit 'E' to the Complaint." Among other things, Exhibit E included statements made by Mr. Grant to Mr. Perrusquia, which purport to have been made available to Mr. Perrusquia before the Article was published.[2] Mr. Grant also included letters he sent to Mr. Robert Lipscomb, Director of Housing and Community Development for the Memphis Housing Authority. Although it is unclear from the record what Mr. Lipscomb's role is in the Southbrook Mall project, the letter indicates that Mr. Grant told Mr. Lipscomb that he intended as of September 6, 2012, the date of the letter, to "remove [him]self from the project." Exhibit E also includes various plans and descriptions of the proposed renovations of the Southbrook Mall.

On June 12, 2014, Appellees moved to dismiss Mr. Grant's original complaint. They argued that it did not state a cause of action upon which relief may be granted under Rule 12.02(6) of the Tennessee Rules of Civil Procedure. Additionally, Appellees asserted that the fair report privilege protected them from liability for statements made in the Article. On the same day, Appellees also moved for a protective order seeking to stay all discovery, including the deposition of Mr. Perrusquia, the Article's author.

---

[2] This document is titled "Prepared Statements Submitted to Marc Perrusquia—Project Reporter." In this document, Mr. Grant provides certain details about who owns the real estate on which the mall sits and when certain real estate purchases occurred. He claims to have no financial interest in the mall project and alleges that "the only reason our project is being stalled . . . But for no other reason, It Is A Black Development."

On June 20, 2014, Mr. Grant filed an amended complaint, which is the operative complaint for purposes of this appeal ("Amended Complaint"). He asserted several additional claims against Appellees in the Amended Complaint, which now included libel, false light invasion of privacy, and "defamation and/or defamation by implication." Specifically, Mr. Grant alleged that the headline in the online version, which read "Silent partner? Grant's involvement clouds $1.5 million Southbrook Mall deal," included a false statement and defamed Mr. Grant. Next, Mr. Grant's Amended Complaint pointed to a quote contained in the article made by Councilman Jim Strickland wherein he said that "[i]t appears [Grant is] one of the principals. And that was not disclosed to the council[.]" Mr. Grant also asserted that the Article implied that he made a presentation before the City Council; that he in fact had an ownership interest in the Southbrook Mall project; and that he failed to disclose this interest to the City Council. In sum, the Article, according to Grant, made it appear that he was dishonest and deceptive. Last, Mr. Grant alleged that Appellees acted with "actual malice" when publishing the Article, and he further asserted that he enjoyed a good reputation in the community that has since been damaged due to the Article's publication.

On June 24, 2014, Mr. Grant filed a response to Appellees' motion for a protective order staying discovery. In his response, he sought full discovery before a hearing on any dispositive motion, including Appellees' motion to dismiss.[3]

On August 14, 2014, Appellees filed a motion to dismiss Mr. Grant's Amended Complaint. The following day, the trial court conducted a hearing on Appellees' motion for a protective order. The trial court partially granted the request, staying all discovery but permitting Mr. Grant to depose Mr. Perrusquia before a hearing on Appellees' motion to dismiss. Mr. Grant subsequently took the deposition of Mr. Perrusquia. It is included in the record on appeal.

On November 14, 2014, the trial court held a hearing on Appellees' motion to dismiss. From the bench, the trial court orally granted the motion and dismissed Mr. Grant's amended complaint in its entirety. A written order incorporating the trial court's oral ruling was entered on January 5, 2015. The trial court granted the motion on two bases: (1) that the complaint failed to state a claim upon which relief can be granted as the statements at issue "are not defamatory or capable of defamatory meaning;" and (2) that Appellees' were protected from liability pursuant to the fair report privilege. The trial court further stated that the dismissal was a final order.

Mr. Grant timely appealed.

---

[3] Around this time, on June 30, 2014, Judge Jerry Stokes of the Shelby County Circuit Court entered an Order recusing himself because he had previously been engaged in civil litigation against Mr. Grant. The matter was randomly reassigned to Judge Robert L. Childers and memorialized by an Order of Acceptance entered July 28, 2014.

4

## II. Issues

As we perceive it, Appellant presents two issues for review:

1. Whether the trial court erred in finding that the fair report privilege precluded liability of Appellees?

2. Whether the trial court erred in finding that the Article was not capable of being defamatory?

## III. Standard of Review

The Tennessee Supreme Court recently outlined the standard of review where a party defending an action files a motion to dismiss the plaintiff's complaint for failure to state a claim upon which relief can be granted: [4]

> A Rule 12.02(6) [of the Tennessee Rules of Civil Procedure] motion challenges only the legal sufficiency of the complaint, not the strength of the plaintiff's proof or evidence. *Highwoods Props., Inc. v. City of Memphis*, 297 S.W.3d 695, 700 (Tenn. 2009); *Willis v. Tenn. Dep't of Corr.*, 113 S.W.3d 706, 710 (Tenn. 2003); *Bell ex rel. Snyder v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A.*, 986 S.W.2d 550, 554 (Tenn. 1999); *Sanders v. Vinson*, 558 S.W.2d 838, 840 (Tenn. 1977). The resolution of a 12.02(6) motion to dismiss is determined by an examination of the pleadings alone. *Leggett v. Duke Energy Corp.*, 308 S.W.3d 843, 851 (Tenn.2010); *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 696 (Tenn. 2002); *Cook ex rel. Uithoven v. Spinnaker's of Rivergate, Inc.*, 878 S.W.2d 934, 938 (Tenn. 1994); *Cornpropst v. Sloan*, 528 S.W.2d 188, 190 (Tenn. 1975) (overruled on other grounds by *McClung v. Delta Square Ltd. P'ship*, 937 S.W.2d 891, 899–900 (Tenn. 1996)). A defendant who files a motion to dismiss "'admits the truth of all of the relevant and material allegations contained in the complaint, but . . . asserts that the allegations

---

[4] We recognize that the record on appeal contains numerous affidavits and other matters extraneous to Mr. Grant's Amended Complaint. These materials were also referenced by counsel at oral argument. However, the trial court, in ruling on Appellees' motion to dismiss, gave no indication that it considered any matters outside of the Amended Complaint. Thus, we proceed with the appeal analyzing the trial court's ruling as a motion to dismiss. *Cf. Moore v. State*, 436 S.W.3d 775, 784 (Tenn. Ct. App. 2014) (explaining that a motion to dismiss is converted to a motion for summary judgment when a trial court considers matters outside of the pleadings). Accordingly, like the trial court, we decline to consider any matter outside the pleadings.

fail to establish a cause of action.'" ***Brown v. Tenn. Title Loans,
Inc.***, 328 S.W.3d 850, 854 (Tenn. 2010) (quoting ***Freeman
Indus., LLC v. Eastman Chem. Co.***, 172 S.W.3d 512, 516
(Tenn. 2005)); *see **Edwards v. Allen***, 216 S.W.3d 278, 284
(Tenn. 2007); ***White v. Revco Disc. Drug Ctrs., Inc.***, 33 S.W.3d
713, 718 (Tenn. 2000); ***Holloway v. Putnam Cnty.***, 534 S.W.2d
292, 296 (Tenn. 1976).

In considering a motion to dismiss, courts "'must construe the
complaint liberally, presuming all factual allegations to be true
and giving the plaintiff the benefit of all reasonable
inferences.'" ***Tigg v. Pirelli Tire Corp.***, 232 S.W.3d 28, 31–32
(Tenn. 2007) (quoting ***Trau-Med***, 71 S.W.3d at 696); *see **Leach
v. Taylor***, 124 S.W.3d 87, 92–93 (Tenn. 2004); ***Stein v.
Davidson Hotel Co.***, 945 S.W.2d 714, 716 (Tenn. 1997); ***Bellar
v. Baptist Hosp., Inc.***, 559 S.W.2d 788, 790 (Tenn. 1978); *see
also **City of Brentwood v. Metro. Bd. of Zoning Appeals***, 149
S.W.3d 49, 54 (Tenn. Ct. App. 2004) (holding that courts "must
construe the complaint liberally in favor of the plaintiff by . . .
giving the plaintiff the benefit of all the inferences that can be
reasonably drawn from the pleaded facts"). A trial court should
grant a motion to dismiss "only when it appears that the plaintiff
can prove no set of facts in support of the claim that would
entitle the plaintiff to relief." ***Crews v. Buckman Labs. Int'l,
Inc.***, 78 S.W.3d 852, 857 (Tenn. 2002); *see **Lanier v. Rains***,
229 S.W.3d 656, 660 (Tenn. 2007); ***Doe v. Sundquist***, 2 S.W.3d
919, 922 (Tenn. 1999); ***Pemberton v. Am. Distilled Spirits Co.***,
664 S.W.2d 690, 691 (Tenn. 1984); ***Fuerst v. Methodist Hosp.
S.***, 566 S.W.2d 847, 848 (Tenn. 1978); ***Ladd v. Roane Hosiery,
Inc.***, 556 S.W.2d 758, 759–60 (Tenn. 1977). We review the trial
court's legal conclusions regarding the adequacy of the
complaint de novo. ***Brown***, 328 S.W.3d at 855; ***Stein***, 945
S.W.2d at 716.

***Webb v. Nashville Area Habitat for Humanity, Inc.***, 346 S.W.3d 422, 426 (Tenn. 2011).
With these principles in mind, we turn to the merits of this appeal.

## IV. Analysis

### A. Fair Report Privilege

As an initial matter, we examine whether Appellees are shielded from liability through the application of the fair report privilege. Mr. Grant argues that the trial court erred by determining the fair report privilege applied to the statements in the Article, namely because the complaint does not indicate that the statements were gathered at any type of official proceeding. On the other hand, Appellees argue that the statements stemmed from official proceedings and, therefore, any liability premised upon the statements was precluded by the privilege. Although the trial court's reasoning is not apparent from the its ruling, the trial court ruled that the Article was covered by the privilege.

Two types of privileges may be raised as a defense in a defamation case: absolute and qualified. *See Simpson v. Strong-Tie Co. v. Stewart, Estes & Donnell*, 232 S.W.3d 18, 22 (Tenn. 2007). An absolute privilege may not be defeated by a defendant's ill-will, malice, or improper purpose. *Id.* (citing Dan B. Dobbs, *The Law of Torts* 1153 (2000)). Thus, an absolute privilege is a complete immunity. *Simpson*, 232 S.W.3d at 22; *see also* Restatement (Second) of Torts Five 25 2 B Intro. Note (1977). On the other hand, "a qualified or conditional privilege is one that may be defeated if the defamatory publication was made with malice, ill-will, or for an improper purpose." *Simpson*, 232 S.W.3d at 22 (citing *Pate v. Serv. Merch. Co.*, 959 S.W.2d 569, 576–77 (Tenn. Ct. App. 1996)). Typically, the qualified privilege associated with defamation "is based upon public policy that recognizes information should be given freely when necessary to protect the actor's own interests, the interests of another, or the interests of the public." *Simpson*, 232 S.W.3d at 22; *see* Restatement (Second) of Torts Five 25 2 B Intro. Note (1977).

The present case involves the fair report privilege. This Court discussed the fair report privilege in *Lewis v. NewsChannel 5 Network, L.P.*, 238 S.W.3d 270 (Tenn. Ct. App. 2007):

> The Tennessee Supreme Court recognized the fair report privilege in 1871. *Saunders v. Baxter*, 53 Tenn. (6 Heisk.) 369, 381 (1871) ("[A] *bona fide* report of the proceedings in a court of justice, in the absence of express malice, is not libel, though the publication may be injurious to the character of an individual"). Over thirty years later, the court pointed out that the foundation of the privilege was the importance attached to keeping the public informed of the proceedings in court, *American Publ'g Co. v. Gamble*, 115 Tenn. 663, 678, 90 S.W. 1005, 1008 (1906), and of the contents of papers filed in court, *Langford v. Vanderbilt Univ.*, 199 Tenn. 389, 399, 287 S.W.2d 32, 37 (1956). Thus, the fair report privilege has traditionally protected "newspapers which make reports of judicial proceedings to the public, in order that members of the public may be apprised of what takes place in the proceedings without

having been present." ***Smith v. Reed***, 944 S.W.2d 623, 625 (Tenn. Ct. App. 1996).

Unlike the absolute privileges attached to statements made during judicial or legislative proceedings, the fair report privilege is a qualified privilege rather than an absolute one. ***Langford v. Vanderbilt Univ.***, 44 Tenn. App. 694, 706, 318 S.W.2d 568, 574 (1958). In order for the privilege to apply, the report must be "a fair and accurate summation of the proceeding," and must display balance and neutrality. ***Smith v. Reed***, 944 S.W.2d at 625. The report need not be a verbatim, technically accurate account in every detail, as long as it conveys a correct and just impression of what took place. ***American Publ'g Co. v. Gamble***, 115 Tenn. at 677, 90 S.W. at 1008; ***Smith v. Reed***, 944 S.W.2d at 625; ***Langford v. Vanderbilt Univ.***, 44 Tenn. App. at 707, 318 S.W.2d at 574–75. However, even a report of a judicial proceeding will not be shielded by the privilege if it contains any false statement of fact regarding what occurred during the proceeding, any garbled or one-sided account of the proceeding, or any defamatory observations or comments. ***Saunders v. Baxter***, 53 Tenn. at 383; ***Black v. Nashville Banner Publ'g Co.***, 24 Tenn. App. 137, 145, 141 S.W.2d 908, 913 (1939).

Since 1871, the application of the fair report privilege has expanded beyond reports of judicial proceedings and the contents of papers filed in court to reports of other official governmental actions. The courts have applied the privilege to reports of public meetings of local government bodies, reports regarding the contents of arrest warrants, and even to reports regarding the contents of search warrants. Accordingly, Tennessee's version of the fair report privilege in its current form closely, though not exactly, mirrors the scope of the privilege found in the Restatement (Second) of Torts § 611, at 297 (1977) ("The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.").

Despite the expansion of the privilege's application, the fair report privilege does not extend so far as to provide protection from liability for fair and accurate reports of statements made by any governmental employee in any circumstance. It remains limited to circumstances involving public proceedings or official actions of government that have been made public. The purpose of the privilege is to serve the public's interest in being informed of official actions or proceedings that are themselves public. Restatement (Second) of Torts § 611 cmt. a, at 297; David A. Elder, *Defamation: A Lawyer's Guide* § 3:12, at 3-38-3-39, 3-42 (2003) ("*Defamation: A Lawyer's Guide*"). It accomplishes this purpose by allowing the media and others to be the eyes and ears of the members of the public who would have been able to witness the proceeding or obtain the information had they been present to see or hear for themselves. W. Page Keeton, *Prosser and Keeton on the Law of Torts* § 115, at 836 (5th ed.1984). The privilege enables persons reporting on official actions or proceedings to broadcast, print, post, or now blog about official actions or proceedings without the fear of being subjected to a tort action for fair and accurate reports, even if these reports contain defamatory or embarrassing statements by governmental employees.

*Lewis*, 238 S.W.3d at 284–85 (footnotes omitted). Accordingly, from *Lewis* and its progeny we gather several factors applicable to the fair report privilege: (1) the report must be of a public proceeding or official actions of government that have been made public; (2) the report must be a fair and accurate summary of the proceedings and must display balance and neutrality; and (3) the report must not be made with actual malice. *See id.*; *Milligan v. U.S.*, 644 F.Supp.2d 1020, 1033 (M.D. Tenn. 2009), *aff'd* 670 F.3d 686 (6th Cir. 2012) (listing and providing discussion of the three factors).

Before analyzing the factors, we note that a defendant who asserts the fair report privilege has the burden of establishing its applicability. *Hayes v. Newspapers of N.H., Inc.*, 141 N.H. 464, 466, 685 A.2d 1237, 1239 (N.H. 1996) (citing W*illiams v. Pulitzer Broad. Co.*, 706 S.W.2d 508, 511 (Mo. Ct. App. 1986)); *see also Carver v. Bonds*, 135 Cal. App. 4th 328, 348–49, 37 Cal. Rptr. 3d 480, 497 (Cal. Ct. App. 2005) ("The Newspaper bears the burden of proving that the privilege applies"). Consequently, we must determine whether, viewing Mr. Grant's complaint in the light most favorable to him, *Trau-Med*, 71 S.W.3d at 696, Appellees have established the elements necessary to show the applicability of the fair report privilege. In doing so, we reiterate that the motion filed by Appellees in the trial court,

9

a Rule 12.02(6) motion to dismiss, "challenges only the legal sufficiency of the complaint, not the strength of the plaintiff's proof or evidence." **Highwoods Props.**, 297 S.W.3d at 700. We address each of the factors regarding the privilege in turn.

First, statements covered by the fair report privilege must stem from an official proceeding. **Lewis**, 238 S.W.3d at 285–86; *see also* **Milligan v. U.S.**, 644 F.Supp.2d 1020, 1034 (M.D. Tenn. 2009) ("The fair report privilege applies to a statement made 'in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern.'") (citing Restatement (Second) of Torts § 611). In **Lewis**, the plaintiff brother-in-law of a major in the city police department sued the defendant television station for defamation and false light invasion of privacy after the station aired a story alleging that the police major "interceded with a subordinate to prevent [plaintiff's] arrest." **Id.** at 274.

The defendant television station claimed that the fair report privilege applied to its broadcast. This Court determined, however, that the privilege did not apply to the defendants' statements because they were not "official agency action, and d[id] not have sufficient 'authoritative weight' to be considered an official public proceeding." **Lewis**, 238 S.W.3d at 287. Furthermore, the circumstances surrounding the arrest and the existence or status of any internal investigations were not generally known by the public. In making these details known, the story described how the high-ranking police official prevented the arrest of his brother-in-law, despite the fact that the brother-in-law had been in possession of weapons, gambling paraphernalia, and a large amount of cash. We reasoned that the defendant television station's "story did more than broadcast to members of the public what they would have read or heard had they been provided with a copy of the Chief of Police's press release." In determining that the privilege did not apply, the Court reiterated: "Official actions and proceedings are the core of the fair report privilege." **Id.** at 287.

In the instant case, the Article, which was attached to the Amended Complaint, includes a variety of statements demonstrating that the information contained therein was not limited to information disseminated during the course of an official proceeding. The Article described the newspaper staff's personal interviews with Mr. Grant and others. As one example, the Article indicates that a newspaper staff member spoke with Mr. Willie Harper in an attempt to investigate further and includes statements from this encounter. Additionally, the Article provides: "An unannounced visit by a reporter to the mall last week found Grant's cellphone number listed on signs as the contact for businesses seeking to lease space in the mall. Tucked away near the rear of the mall, Grant keeps an office, where he moved last spring, and where he fielded the newspaper's questions." In addition to these extraneous interviews, the Article includes descriptions of the property, as specific as noting a leaky, discolored roof. Furthermore, the Article references other interactions or personal interviews that the Article's author had with various individuals, including a letter from Mr. Grant

10

written to Mr. Lipscomb concerning the project; an interview with Councilman Strickland; an interview with Councilwoman Janis Fullilove; and an interview with Councilman Shea Flinn.

As stated in *Lewis*, the privilege is designed to permit newspapers and other outlets "to be the eyes and ears of the public who would have been able to witness the proceeding or obtain the information had they been present to see or hear for themselves." *Lewis*, 238 S.W.3d at 285. Here, the inclusion of certain investigatory interviews and descriptions clearly falls outside of the scope of the fair report privilege because their ties to any official proceedings are tenuous at best. Thus, Appellees have failed to establish that the Article falls within the official action prong of the privilege.

Still, Appellees contend that the statements attributed to Councilman Strickland fall squarely within the privilege because he made them while acting in his official capacity. Appellees argue, as stated in their brief, that *Lewis* stands for the proposition that the "privilege [applies] to news reports of statements made to a reporter during an interview with a government official speaking in his official capacity." Respectfully, we disagree that a fair reading of the *Lewis* opinion mandates dismissal at this early stage in the litigation.

Upon examining the quote attributed to Councilman Strickland in the case-at-bar, we conclude that the Appellees have failed to establish the applicability of the privilege because the Article does not indicate whether Councilman Strickland's statement was made in his official capacity or in connection with any official proceedings. The Article provides:

> "This was the worst project we ever approved," said Councilman Jim Strickland, who voted against it and believes the developers have not been straightforward about who controls it. Strickland questioned the development group's retail experience at the Oct. 1 meeting when he also asked for the roster of Southbrook Properties' board of directors. He later said the answers he got seemed "intentionally mysterious."
>
> After learning details of the newspaper's visits to the mall last week, Strickland said he's even more disturbed about the mall's ownership and Grant's role in the project.
>
> "It appears he's one of the principals. And that was not disclosed to the council," Strickland said.

The Article suggests that the councilman's commentary came after the project's approval, but it does not indicate whether such remarks were made off-handedly or in his official capacity.

11

Like the court in **Lewis**, we decline to extend the fair report privilege to apply to the "informal reports and official and unofficial investigations, contacts, and communications . . . ." Considering Mr. Grant's complaint in the light most favorable to him, we must conclude that the privilege has not been established, as the councilman's statement could reasonably be read as involving an "unofficial, off-the-record statement[]" that "lack[s] the dignity and authoritative weight of official actions and proceedings." **Lewis**, 238 S.W.3d at 286.

Because we have determined that the first prong of the privilege, official action, has not been met, we need not consider whether it was a fair and accurate report or whether Appellees acted with actual malice. Still, in the interest of thoroughness, we point out that, with respect to the second prong of the privilege, we are also unable to conclude, at the motion to dismiss stage, that the report is a fair and accurate summation of the proceedings and that the report displays balance and neutrality. Respectfully, the requirements that the report be factually correct, accurate, balanced, and neutral involve factual issues that cannot be resolved at this stage in the litigation absent admission, stipulation, or proof as to accuracy.[5] Finally, we also point out that Mr. Grant has sufficiently pleaded "actual malice" so as to preclude application of the fair report privilege at this stage of the litigation. *See also* **Simpson**, 232 S.W.3d at 22 (opining that a qualified privilege, such as the fair report privilege, may be defeated by actual malice) (citing **Pate v. Serv. Merch. Co.**, 959 S.W.2d 569, 576–77 (Tenn. Ct. App. 1996)).

Based on the foregoing analysis, we are unable to conclude that the privilege applies to any portion of the Article at this stage in the litigation. The trial court's ruling that the privilege applies is, therefore, reversed.

## B. Causes of Action

Since we have determined that the fair report privilege is inapplicable at this point in the litigation, our next question must be whether Mr. Grant's Amended Complaint

---

[5] Appellees appear to argue that Mr. Grant's Amended Complaint admits that the quote attributed to Councilman Strickland was properly attributed to him. Appellees argue that, because Mr. Grant admits that the statement "is an accurate quote" from Councilman Strickland concerning a proposal for funding before the City Council, it falls within the purview of the fair report privilege. Respectfully, we disagree. Appellees assertion assumes that Mr. Grant also admits the statement was made during or in connection with such official proceedings and not just an off-hand remark; however, as discussed *supra*, such inferences are not supported by a fair reading of the Amended Complaint and Article. To this end, the Article offers no explanation for the context of the statement. Although we find that Appellees' argument in this regard requires a strained reading of the complaint, we also note that fairness is but one component of the privilege and even *assuming arguendo* that Mr. Grant admitted that the article contained an accurate account of Councilman Strickland's statement, for purposes of this appeal, this admission would not alter the outcome of this Opinion.

sufficiently pleads his causes of action. In his complaint, Mr. Grant lists his causes of action as follows:

> []First Cause of Action: Libel [] for False Statements in the Online Headline
>
> . . .
>
> []Second Cause of Action: Libel [] for False Statements in the Body of the Online and Print Articles
>
> . . .
>
> []Third Cause of Action: False Light Invasion of Privacy [] for False Statements in the Headlines and Bodies of the Online and Print Articles[6]
>
> . . .
>
> []Fourth Cause of Action: Defamation and/or Defamation by Implication [] for Statements in the Headlines and Bodies of the Online and Print Articles

We note, however, that our Opinion is limited to only reviewing issues adjudicated by the trial court. *Shaffer v. Memphis Airport Auth., Service Mgmt. Sys., Inc.*, No. W2012-00237-COA-R9-CV, 2013 WL 209309, at *4 (Tenn. Ct. App. Jan. 18, 2013) ("At the appellate level, 'we are limited in authority to the adjudication of issues that are presented and decided in the trial courts . . . .'") (quoting *Dorrier v. Dark*, 537 S.W.2d 888, 890 (Tenn. 1976)). The trial court's ruling did not adjudicate, and the parties did not request decisions on, issues concerning whether the allegations in the Article were true; whether Mr. Grant was a public or private figure; whether the Article covered a matter of public concern; and whether Mr. Grant's claims otherwise pass constitutional muster. Accordingly, we decline to address those issues here. We consider Mr. Grant's causes of action for defamation and defamation by implication separately.

---

[6] Mr. Grant's Amended Complaint included a cause of action for false light invasion of privacy. In its ruling on Appellees' motion to dismiss, the trial court dismissed the Amended Complaint in its entirety, including the false light claim. While Mr. Grant's statement of the issues may be read to include the dismissal of the false light claim as an issue on appeal, Mr. Grant's appellate brief includes no argument relevant to his false light claim. Indeed, his brief is devoid of the term "false light." Accordingly, we decline to address this issue. *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 401 (Tenn. Ct. App. 2006) (holding that the "failure of a party to cite any authority or to construct an argument regarding his position on appeal constitutes waiver of that issue").

*Defamation*

As stated above, Mr. Grant included causes of action for both libel and defamation. Libel is written defamation. ***Davis v. The Tennessean***, 83 S.W.3d 125 (Tenn. Ct. App. 2001). Accordingly, we consider Mr. Grant's causes of action for libel and defamation together. Mr. Grant asserted that the defamation in the Article stemmed from the implication that he was deceptive or dishonest. The trial court dismissed Mr. Grant's entire Amended Complaint on the ground that it failed to state a claim upon which relief may be granted because the statements at issue were not capable of defamatory meaning.

Mr. Grant asserts that the Article falsely depicts him as being dishonest and deceptive regarding his involvement in the Southbrook Mall project. In his Amended Complaint, Mr. Grant focuses on several allegedly untrue statements and resulting implications that he asserts as defamatory. Specifically, as restated from the Amended Complaint, Mr. Grant claims that these allegedly defamatory statements and resulting inferences include: (1) the statement in the Article's online version headline stating, "Silent partner? Grant's involvement clouds $1.5 million Southbrook Mall deal"; (2) the statement attributed to Councilman Strickland, which said: "It appears Grant is one of the principals. And that was not disclosed to the council[.]"; (3) the statement or implication that Mr. Grant made presentations to the Memphis City Council; (4) the statement or implication that Mr. Grant had an ownership interest in the Southbrook Mall project; and (5) the statement or implication that Mr. Grant concealed his involvement from the City Council.

In addition to these specific references to the Article, Mr. Grant generally alleged in his Amended Complaint that the implication of the Article was that he was "dishonest and/or a liar." In his brief, he argues that the Article implied that he deceived Memphis's city leaders, including the City Council, to believe he would not be involved in the project so that the council would approve government funding. According to Mr. Grant's Amended Complaint, the implication is false because he has remained honest and straightforward with city leaders regarding his non-ownership involvement in the Southbrook Mall project.

Appellees, on the other hand, contend that the Article was only intended to communicate that questions surrounded the extent of Mr. Grant's involvement in the project. They argue that Mr. Grant's interpretation of the Article distorts the Article's "natural and ordinary" language. Appellees assert that the trial court correctly determined that, as a matter of law, the Article was not capable of being defamatory.

As recently stated by this Court in ***Aegis Sciences Corp. v. Zelenik***, No. M2012-00898-COA-R3-CV, 2013 WL 175807 (Tenn. Ct. App. Jan. 16, 2013) (no perm. app. filed):

> The basis of a defamation action, whether it be for libel or
> slander, is that the allegedly defamatory statement has injured

14

the plaintiff's character and reputation. ***Quality Auto Parts Co., Inc. v. Bluff City Buick Co.***, Inc., 876 S.W.2d 818, (Tenn. 1994) (citation omitted). To establish a prima facie case, the plaintiff in a defamation action must establish "1) a party published a statement; 2) with knowledge that the statement is false and defaming to the other; or 3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." ***Sullivan v. Baptist Memorial Hosp.***, 995 S.W.2d 569, 571 (Tenn. 1999). Only false statements are actionable, and truth is a nearly universal defense. ***West v. Media Gen. Convergence, Inc.***, 53 S.W.3d 640, 645 (Tenn. 2001) (citations omitted). "'[I]n defamation cases the interest sought to be protected is the objective one of reputation, either economic, political, or personal, in the outside world.'" ***Id.*** (quoting ***Crump v. Beckley Newspapers, Inc.***, 173 W.Va. 699, 320 S.E.2d 70, 83 (1984) (quoting Thomas Emerson, *The Right of Privacy and Freedom of the Press*, 14 Harv. C.R.-C.L. L.Rev. 329, 333 (1979))). For a written statement to be defamatory, "'it must constitute a serious threat to the plaintiff's reputation.'" ***Revis v. McClean***, 31 S.W.3d 250, 252–53 (Tenn. Ct. App. 2000) (quoting ***Stones River Motors, Inc. v. Mid-South Publ'g Co.***, Inc., 651 S.W.2d 713, 719 (Tenn. Ct. App. 1983) (citations omitted)). A published statement is not libelous because the subject of the publication finds it "'annoying, offensive or embarrassing.'" ***Id.*** (quoting ***id.***). Rather, the statement "must reasonably be construable as holding the plaintiff up to public hatred, contempt or ridicule[ ]" and convey "an element 'of disgrace.'" ***Id.*** (quoting ***id.***). A statement is defamatory "if it tends so to harm the reputation of another as to lower him [or her] in the estimation of the community or to deter third persons from associating or dealing with him [or her]." ***Biltcliffe v. Hailey's Harbor, Inc.***, No. M2003-02408-COA-R3-CV, 2005 WL 2860164, at *4 (Tenn. Ct. App. Oct. 27, 2005) (quoting Restatement (Second) of Torts § 559 (1977); *see also* ***Quality Auto Parts Co. v. Bluff City Buick Co.***, 876 S.W.2d 818, 820 (Tenn. 1994) (holding that the basis of a defamation action is that the defamation resulted in injury to the plaintiff's character or reputation); ***Davis v. The Tennessean***, 83 S.W.3d 125, 128 (Tenn. Ct. App. 2001) (holding that the defamatory

15

statement must result in injury to the plaintiff's character and reputation)).

2013 WL 175807, at *5.

Whether a statement was understood in a defamatory sense is generally a question of fact reserved for the trier of fact. ***Stones River Motors, Inc. v. Mid-South Pub'g Co.***, 651 S.W.2d 713, 719 (Tenn. Ct. App. 1983). However, the question of whether something is "capable of conveying a defamatory meaning" presents a question of law for the trial court. ***Revis v. McClean***, 31 S.W.3d 250, 253 (Tenn. Ct. App. 2000). A trial court may determine that a statement is not defamatory as a matter of law only when "the statement is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense." ***Aegis Sciences Corp.***, 2013 WL 175807, at *6 (citing ***Biltcliffe v. Hailey's Harbor, Inc.***, No. M2003-02408-COA-R3-CV, 2005 WL 2860164, at *4 (Tenn. Ct. App. Oct. 27, 2005)). When considering whether a statement is capable of being defamatory, it must be judged within the context it is made. ***Revis***, 31 S.W.3d 253. Additionally, it "should be read as a person of ordinary intelligence would understand [it] in light of the surrounding circumstances." ***Id.*** (citations omitted). To this end, courts are not bound to the plaintiff's interpretation of the allegedly defamatory material, and if the words "do not reasonably have the meaning plaintiff ascribes to them, the court must disregard" plaintiff's interpretation. ***Stones River Motors, Inc. v. Mid-South Pub. Co.***, 651 S.W.2d 713 (Tenn. Ct. App. 1983) (citing ***Dupont Eng'g Co. v. Nashville Banner Pub'g Co.***, 13 F.2d 186 (M.D. Tenn. 1925)).

As a preliminary matter, we point out that although Appellees' argument focuses on singular statements from the Amended Complaint and attached Article, "[s]tatements must be taken in context in cases like this one." ***Biltcliffe v. Hailey's Harbor, Inc.***, No. M2003-02408-COA-R3-CV, 2005 WL 2860164, at *6 (Tenn. Ct. App. Oct. 27, 2005) (citation omitted). To determine the extent of the "context," we turn to guidance from our sister states. Our research has revealed that courts reviewing defamation cases should review the statement in the "full context of the communication in which the statement is made; and consideration of the broader social context surrounding the communication . . . ." ***McGill v. Parker***, 179 A.D.2d 98, 110, 582 N.Y.S.2d 91, 98 (1992). "Isolating [statements] and first extracting [their] express and implied factual statements, without knowing the full context in which they were uttered, indeed may result in identifying many more implied factual assertions than would a reasonable person encountering that expression in context." ***Immuno AG. v. Moor-Jankowski***, 77 N.Y.2d 235, 255, 567 N.E.2d 1270, 1281 (1991). This comports with our duty to consider not just isolated statements, but also "[t]he import of [the] language as a whole" to determine whether a communication may be deemed defamatory. ***Secured Fin. Solutions, LLC v. Winer***, No. M2009-00885-COA-R3-CV, 2010 WL 334644, at *3 (Tenn. Ct. App. Jan. 28, 2010). Accordingly, although both parties' briefs focus on singular

16

statements from the Article, we instead rely upon the context of the Article as a whole in determining whether it was capable of defamatory meaning.

Recent Tennessee case law provides some guidance on what type of statements are "capable of" defamatory meaning. Statements that are in question form can be libelous under certain circumstances. *Eisenstein v. WTVF-TV, News Channel 5 Network, LLC*, 389 S.W.3d 313, 320 (Tenn. 2012). To be considered defamatory, "a question must be reasonably read as an assertion of false fact; inquiry itself, however embarrassing or unpleasant to its subject, is not accusation." *Id.* (citing *Secured Fin. Solutions, LLC v. Winer*, M2009-00885-COA-R3-CV, 2010 WL 334644, at *3 (Tenn. Ct. App. Jan. 28, 2010) (quoting 50 Am. Jur. 2d *Libel and Slander*§ 154 (2006)). In *Eisenstein*, a news anchor began a news report concerning a local judge with, "Is the presiding judge of Davidson County's general sessions court facing an ethics investigation?" *Id.* Following the question, the anchor stated, "Judge Dan Eisenstein's lawyer insists that he's not." Another anchor then states, "But a recent court filing tells a different story with an attorney for the court that regulates Tennessee judges hinting that there may indeed be an investigation."

Although the plaintiff judge in *Eisenstein* argued that the defendants asserted that he was under investigation, the Court of Appeals found no such assertion by the defendants in their broadcast and concluded that defendants merely raised a fairly-answerable question.[7] The Court of Appeals noted that "[t]hree separate times the broadcast mentioned that Judge Eisenstein's lawyers said that there was no investigation. The question of 'is there an investigation' is not answered." The court added that the question "invite[d] an answer of 'yes,' 'no,' or 'I don't know.'" Therefore, the Court of Appeals held that the question raised by the defendants' news broadcast was insufficient to be deemed an assertion for purposes of Judge Eisenstein's defamation claim. The Court's holding did not opine on whether the statements were "capable of" defamatory meaning, but solely whether they constituted an "assertion" that the Judge was being investigated.

On its face, the Article here raises a question about Mr. Grant's involvement in the Southbrook Mall project and whether he was being honest with city officials. However, like the Court in *Eisenstein*, we must conclude that the question raised does not constitute an "assertion" by the Appellees that Mr. Grant was either hiding his involvement or deceiving city officials. "It is not equivalent to a direct charge." *Eisenstein*, 389 S.W.3d 313, 321 (Tenn. Ct. App. 2012) (citing *McCluen v. Roane Cnty. Times*, 936 S.W.2d 936, 940 (Tenn. Ct. App. 1996). The Article did not include an answer to the question regarding Mr. Grant's

---

[7] It is important to note that the Court was charged with reviewing the matter under a summary judgment standard, and its analysis focused on whether the news broadcast's questions concerning the investigation could be fairly termed a defamatory "assertion."

involvement. Several times, the Article included Mr. Grant's own statements concerning his involvement with the project, and the questions concerning whether Mr. Grant was dishonest or deceptive to city leaders remains unanswered by the Article. Based on our Opinion in *Eisenstein*, we must conclude that the Article at issue does not form an assertion under which Mr. Grant's claim of defamation can be sustained for purposes of a motion to dismiss. Interestingly, the *Eisenstein* Court noted that Judge Eisenstein had not pleaded a claim for defamation by implication, thereby limiting its analysis to defamation only. In this case, however, unlike Judge Eisenstein, Mr. Grant did specifically plead in his Amended Complaint that the Article implied he was dishonest or deceptive. Accordingly, we next turn to determine whether Mr. Grant sufficiently pleaded defamation by implication.

*Defamation by Implication*

Defamation by implication is another mechanism by which plaintiffs may prove defamation.[8] Tennessee law provides that a statement may be capable of defamatory meaning even if the words do not appear defamatory on their face, but instead imply or suggest a defamatory meaning. *See* **Pate v. Serv. Merch. Co.**, 959 S.W.2d 569 (Tenn. Ct. App. 1996).

Defamation by implication occurs when statements that are true are nevertheless actionable if they imply facts that are not true. **Aegis Sciences**, No. M2012-00898-COA-R3-CV, 2013 WL 175807, at *11 (Tenn. Ct. App. Jan. 16, 2013). More specifically,

> "[d]efamation by implication" is false suggestions, impressions and implications arising from otherwise truthful statements. Defamation by implication arises not from what is stated but from what is implied when a defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts, such that the defendant may be held responsible for the defamatory implication, unless it qualifies as an opinion, even when the particular facts are correct. Otherwise, by a careful choice of words in juxtaposition of statements in a publication, a potential defendant may make statements that are true yet just as damaging as if they were actually false. Defamation by implication is also referred to as "innuendo." For example, an article was found implicitly defamatory where it truthfully reported that a woman upon finding her husband at plaintiff's

---

[8] The Court's opinion in *Eisenstein* seems to denote that a distinction exists between defamation, defamation by implication, and false light in a footnote: "Judge Eisenstein did not plead a cause of action for defamation by implication, thereby placing all of his eggs in the basket of false light." *Eisenstein*, 389 S.W.3d at 318 n.5.

home, shot the plaintiff, but the article neglected to state that at the time they were all at a social gathering with several other people, including plaintiff's husband. Courts apply differing standards to defamation by implication actions from requiring the defamatory implication to arise from a material omission to not allowing such an action as contrary to free speech values. Some courts do not permit an action for defamation by implication against public figures or public officials.

4 Modern Tort Law: Liability and Litigation § 36:2 (2d ed.). A recent case from the State of Washington offers some guidance on what a plaintiff must allege to sustain his defamation by implication action: "For defamation by implication, a plaintiff must prove all elements of defamation, including that a statement is provably false—**either because it is a false statement or leaves a false impression**." *Corey v. Pierce Cnty.*, 222 P.3d 367, 373 (Wash. Ct. App. 2010) (emphasis added).

As stated above, Tennessee courts have recognized the doctrine of defamation by implication. *See generally Aegis Sciences Corp.*, 2013 WL 175807. In one case, *Pate*, the Court of Appeals held that a store clerks' statements, identifying plaintiff as the user of a credit card from a photographic lineup, was capable of being defamatory based on its implied meaning. *Pate v. Serv. Merch. Co.*, 959 S.W.2d 569 (Tenn. Ct. App. 1996). Despite the statement not being defamatory on its face, we concluded that the statement was capable of defamatory meaning because it inferred that the buyer was involved in theft of a credit card.[9] Although it may not be defamatory on its face, "in such cases the words are said to require an innuendo—that is, a statement of circumstances which give to the words a signification and meaning which they do not have on their face, but which cannot enlarge, extend, or change the sense of the words." *Id.* at 574 (citing *Fry v. McCord Bros.*, 33 S.W. 568 (1895)). The issue of truth aside, the "proper question is whether the meaning reasonably conveyed by the published words is reasonably understood in a defamatory sense by the reader or listener." *Id.* (citing *Tompkins v. Wisener*, 33 Tenn. 458 (Tenn. 1853); Restatement (Second) of Torts § 563 (1977)). Thus, the *Pate* Court reiterated the proposition that an action for defamation may lie even when the defamatory message is not explicitly stated, but when it is conveyed by implication. *See also Memphis Pub. Co. v. Nichols¸* 569 S.W.2d 412, 420 (Tenn. 1978).

Another case, *Zius v. Shelton*, also sheds some light on defamation by implication. In *Zius v. Shelton*, No. E1999-01157-COA-R9-CV, 2000 WL 739466 (Tenn. Ct. App. June 6, 2000), the plaintiff government official brought suit against defendants associated with a local newspaper based on editorial comments published in the newspaper. Two editorial

---

[9] Although the Court concluded the statement was capable of being defamatory, the defendants' liability was ultimately precluded based on an applicable privilege. *Id.* at 576–78.

pieces published by defendants criticized the city government for the implementation of pay raises for certain city employees that were made against the recommendation of the city manager and an outside study. *Id.* at 1. Plaintiff was among one of the employees who received a pay raise.

One of the editorial pieces in the case asserted that the raise constituted "hush money," and stated that the plaintiff received the pay raise because she "sits in the same office" as the mayor, and "[s]he hears, she sees, she knows all." The editorial went further, posing questions such as, "What does [the mayor] . . . have to hide . . . that is worth [the pay raise?] . . . How about this-did you know . . . that [Mayor] 'Come Into My Parlor' [] likes to offer liquor to young damsels in his city-owned office?"

The second editorial stated, "What was the real reason for authorizing such a hefty pay increase when most other employees are asked to bite the bullet? We leave that to your imagination." The plaintiff argued that these statements were defamatory because they suggested or implied that she had either engaged in or covered up criminal or unethical conduct. We reiterated that, although the defendants could later argue truth as a defense, at the motion to dismiss stage, we were required to take all allegations in the complaint as true. Affirming the trial court's denial of defendants' motion to dismiss, this Court determined that the inferences reasonably drawn from the editorials were capable of being defamatory because the editorials "implie[d] [the plaintiff] is aware of illegal or immoral activities, yet is willing to accept money to prevent her from disclosing information regarding those activities." *Id.* at 4. Thus, the Court concluded that because the statements "could be found to be detrimental to [the plaintiff's] reputation" if untrue, the article contained "false and defaming facts" that were actionable in a defamation action. *Id.*

In the case-at-bar, the inferences and implications created by the Article do not appear on the face of the Article, but appear because the Article "juxtaposes a series of facts so as to imply a defamatory connection between them." *See* 4 Modern Tort Law: Liability and Litigation § 36:2 (2d ed.). As one example, the Article points to a letter written from Mr. Grant to Mr. Lipscomb wherein Mr. Grant wrote that he had "removed himself from the project." Then, the Article, seemingly attempting to undercut Mr. Grant's assertion in his letter to Mr. Lipscomb, states: "Recently filed state records, however, list Grant as the registered agent for Southbrook Properties, Inc. . . ." As a second example, the Article provides: "After an initial round of quibbling, Grant agreed he maintains an office at Southbrook." The clear import of the preceding sentence is that Mr. Grant avoided admitting to the newspaper that he maintained an office at the mall. To this end, Mr. Grant specifically pleaded that the implication of the Article was to portray him as dishonest and deceptive. In our opinion, the statements made in the Article, like the statements in the editorials suggesting the mayor's assistant concealed the mayor's immoral or unethical conduct in *Zius*, are capable of implicitly bearing a defamatory meaning when read by a reasonable person.

Tennessee law provides that courts reviewing defamation complaints should consider whether the statements could be harmful to the plaintiff's reputation. Here, we must conclude that the implication that Mr. Grant is a dishonest businessman could cause harm to his reputation in the community. A statement will be deemed capable of defamation "if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Biltcliffe v. Hailey's Harbor, Inc.*, No. M2003-002408-COA-R3-CV, 2005 WL 3860164, at *4 (Tenn. Ct. App. Oct. 27, 2005) (quoting Restatement (Second) of Torts § 559 (1977)); *see also Quality Auto Parts Co. v. Bluff City Buick*, 876 S.W.2d 818, 820 (Tenn. 1994) (holding that the basis of a defamation action is that the defamation resulted in injury to the plaintiff's character or reputation); *Davis v. The Tennesseean*, 83 S.W.3d 125, 128 (Tenn. Ct. App. 2001) (holding that the defamatory statement must result in injury to the plaintiff's character and reputation).

As guidance, we rely on *McWhorter v. Barre*, 132 S.W.3d 354 (Tenn. Ct. App. 2003), wherein the plaintiff pilot sued the defendant, also a pilot, for defamation based on a letter the defendant wrote to the Federal Aviation Administration ("FAA"). *Id.* at 356. The defendant's letter stated that plaintiff was medically unfit to be a pilot because he demonstrated a "marked personality change," suffered from frequent headaches requiring large amounts of ibuprofen, and often fell asleep in the cockpit for periods of two to ten minutes at a time. *Id.* at 357. Reserving the factual questions of truth and accuracy, the court concluded that, as a matter of law, the letter was capable of being understood as defamatory because it held the plaintiff up to ridicule and carried an element of disgrace. According to the Court, the words used in the letter, taken at their "plain and natural import," were capable of defamatory meaning because they held the plaintiff up to disgrace and ridicule as a pilot. *See also Stones River Motors, Inc. v. Mid-South Pub'g Co.*, 651 S.W.2d 713, 719 (Tenn. Ct. App. 1983).

Here, the Article is capable of conveying to a reasonable reader the impression that Mr. Grant deceived city leaders and is concealing his involvement in the Southbrook Mall project. It is well-established in Tennessee law that publishing a false statement accusing a person of dishonesty is actionable. *Williams v. Karnes*, 23 Tenn. 9, 11 (1843) ("It is enough to render an ill opinion to be had of the plaintiff, or make him contemptible and scandalous.") (quoting Lord John Holt, 3 Salk. 226); *Wood v. Del Giorno*, 2006-1612 (La. App. 4 Cir. 12/19/07), 974 So. 2d 95, 99 (La. Ct. App. 2007), *writ denied*, 977 So. 2d 933 ("Words which convey an element of personal disgrace, dishonesty, or disrepute are defamatory."). In the case-at-bar, we must conclude the statements in the Article constitute a threat to Mr. Grant's reputation. The plain and natural import of the Article's language and implications suggest that Mr. Grant has not been forthright with city leaders regarding his control or financial interest over the project. Similar to the letter in *McWhorter*, the nature of these allegations may hold Mr. Grant up to ridicule and disparage any reputation he had as a fair

21

and forthright businessman. Because the Article is capable of harming Mr. Grant's reputation as a businessperson, it will also likely "deter third persons from associating or dealing with him." *Biltcliffe*, No. 2005 WL 3860164, at \*4.

Based on the foregoing and assuming, as we must for purposes of a motion to dismiss, that all of Mr. Grant's allegations are true, we agree that these statements are capable of being defamatory sufficient to avoid dismissal of  Mr. Grant's claim of defamation by implication. We, therefore, reverse the trial court's dismissal of the complaint as to Mr. Grant's defamation by implication claim. However, we affirm the trial court's dismissal of Mr. Grant's defamation claim.

## V. Conclusion

The judgment of the Shelby County Circuit Court is reversed in part as to its determination that the fair report privilege applied; affirmed in part as to the dismissal of Mr. Grant's defamation and false light claims; and reversed in part as to the dismissal of Mr. Grant's defamation by implication claim. This cause is remanded to the trial court for all further proceedings as are necessary and are consistent with this Opinion. Costs of this appeal are taxed one-half to Appellant Greg Grant, and his surety, and one-half to Appellees, The Commercial Appeal, The Memphis Publishing Company, Marc Perrusquia, Louis Graham, and George Cogswell, III, for all of which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE

22